**EXHIBIT A**

**ASSET PURCHASE AGREEMENT DATED APRIL 21, 2016,**
**BY AND BETWEEN DEBTOR AND AFFORDABLE MID COAST HOUSING, LLC**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into as of April 21, 2016 (the "Effective Date"), by and among The Michael King Smith Foundation, a trust established under the laws of the State of Oregon (the "Seller"), and Affordable Mid Coast Housing, LLC ("Affordable"), or his assignees, (the "Buyer"). Hereinafter, the Seller and Buyer may be collectively or singularly referred to as "Parties" or a "Party."

**WHEREAS,** the Seller is a trust established under the laws of the State of Oregon, and is the owner of real and personal property that comprises a portion of the Evergreen Aviation and Space Museum Campus (the "Campus") in McMinnville, Oregon; and

**WHEREAS**, the Seller currently leases portions of the Campus to Evergreen Aviation and Space Museum and the Captain Michael King Smith Educational Institute (the "Museum"), including land and improvements commonly known as the Evergreen Wings and Waves Water Park (the "Water Park"), the Evergreen Space Museum (the "Space Museum"), and surrounding parking lots;

**WHEREAS,** on January 26, 2016, Seller filed a petition for relief under Chapter 11, Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the District of Oregon (the "Bankruptcy Court") Case Number 16-30233-rld11 (the "Bankruptcy Case"); and

**WHEREAS**, the Seller desires to sell certain specified assets (defined below as the "Purchased Assets") owned by Seller, and the Buyer desires to purchase such assets pursuant to the terms and conditions of this Agreement and pursuant to an order of the Bankruptcy Court (as hereinafter defined) approving such sale (the "Sale Order") under Section 363 the Bankruptcy Code, such Sale Order to include the assumption and assignment of certain executory contracts as provided herein pursuant to Section 365 of the Bankruptcy Code; and

**WHEREAS**, the Seller also desires to sell the rest of its assets (the "Remaining Assets") not defined as the Purchased Assets under this Agreement, pursuant to the Sale Order, to generate sufficient proceeds necessary to pay Seller's secured creditors in full, to ensure compliance with Section 363(f) of the Bankruptcy Code.

**NOW THEREFORE,** in consideration of the promises, covenants and other consideration described herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows, intending to be legally bound:

## ARTICLE 1
## TRANSFER OF ASSETS AND PURCHASE PRICE

1.1     Purchased Assets. Subject to the terms and conditions of this Agreement, the Seller agrees to sell, convey, transfer and deliver to the Buyer at the Closing (as hereinafter defined) all right, title and interest of the Seller in and to the assets specifically described on Exhibit A (collectively, the "Purchased Assets"), free from all claims, defaults, liens, taxes, debts and

encumbrances of any kind, except for the liabilities listed on Schedule 1.1 (the "Assumed Liabilities").

1.2    Consideration. The consideration to be paid by the Buyer to the Seller for the Purchased Assets shall be Seven-Million Seven-Hundred Thousand dollars ($7,700,000) (the "Purchase Price"). The Purchase Price shall be allocated as follows:

| | |
|---|---|
| Space Museum: | $2,200,000.00 |
| Water Park: | $1,800,000.00 |
| Chapel: | $  200,000.00 |
| Corsair FG-1D: | $2,000,000.00 |
| P-51D Mustang: | $1,000,000.00 |
| Canso PBY: | $     80,000.00 |
| Cassutt Racer: | $     80,000.00 |
| Ryan NYP: | $     80,000.00 |
| FW-190A Replica: | $     80,000.00 |
| Ryan ST3KR: | $     80,000.00 |
| Douglas DC-#-A: | $     80,000.00 |
| Artifacts/Furniture/Equipment: | $     20,000.00 |

1.3    Deposit.

        (a)    No later than ten (10) days following the execution of this Agreement, Buyer shall deposit $1,000,000 in cash (the "Deposit") with Ticor (as defined in Section 1.4, below), to be held until disbursed (such disbursement to be by joint written instruction of the Parties) either to Buyer or Seller as follows:

                (i) If the Closing shall occur, then the Deposit shall be applied toward the Purchase Price payable by Buyer to the Seller under Section 1.2 and shall be paid to Seller pursuant to the Sale Order;

                (ii) If this Agreement is terminated pursuant to Sections 9.1(a) or 9.1(b), then the Deposit will be returned to Buyer within one (1) business day of termination;

                (iii)If this Agreement is terminated by the Buyer pursuant to Sections 9.1(c), and if the Agreement was then terminable by the Buyer pursuant to such Section, then the Deposit will be returned to Buyer within one (1) business day of termination.

        (b)    At the Closing, Buyer shall pay the Purchase Price, less the Deposit (which would be distributed to Seller pursuant to Section 1.3(a)(i)), to Seller by wire transfer to the account(s) designated by Seller or as otherwise provided in the Sale Order.

1.4    Escrow.

        (a)    Opening of Escrow for Aircraft. Buyer and Seller shall deliver a fully executed copy of this Agreement to Dixie Aire Title Service, Inc., PO Box 270838, Oklahoma

City, OK 73137 ("Dixie"), Attention Lynnelle Brents. Dixie shall act as escrow agent for the administration of this Agreement with respect to FAA registered aircraft to be sold pursuant to this Agreement.

(b)     Opening of Escrow for Real Property and Personal Property. Buyer and Seller shall deliver a fully executed copy of this Agreement to Ticor Title, 105 NE 4th Street, McMinnville, OR 97128 ("Ticor"), Attention Kimberly Dunckel. Ticor shall act as escrow agent for the administration of this Agreement with respect to real and personal property.

(c)     Escrow Instructions. Buyer and Seller hereby authorize their respective attorneys to execute and deliver to Dixie and Ticor any additional or supplemental instructions as may be necessary or convenient to implement the terms of this Agreement and to close this transaction. In the event of any conflict between such additional or supplemental instructions and the express terms of this Agreement, the terms of this Agreement shall control.

(d)     Closing Date. This transaction shall close within Five 5 business days after entry of an order by the Bankruptcy Court (the "Bankruptcy Sale Order") approving the sale of the Purchased Assets to Buyer, provided that all contingencies to Closing have been satisfied

1.5     Allocation of Proceeds. See Section 1.2 above.

1.6     Assignment of Contracts, Leases and Other Assets.

(a)     Subject to the terms and conditions of this Agreement, as of the Closing, the Seller shall assign and transfer to the Buyer all of the Seller's right, title and interest in and to, and the Buyer shall assume all the rights of the Seller, and, except as provided hereunder, shall assume, perform and discharge, by Bankruptcy Court order, pursuant to Section 365 of the Bankruptcy Code, all of the obligations of the Seller for performance from and after the Closing, under the following contracts (the "Assigned Contracts"):

(i)     That certain Lease dated June 1, 2011, by and between Seller and the Museum regarding the Water Park, as amended from time to time, but excluding any claims the Seller has against the Museum for unpaid property taxes;

(ii)     That certain Lease dated June 1, 2008, by and between Seller and the Museum regarding the Space Museum, as amended from time to time, but excluding any claims the Seller has against the Museum for unpaid property taxes.

(iii)     Seller's obligation to provide the Museum with certain no cost, triple-net leases, as specifically set forth in the bankruptcy case filed by Evergreen Vintage Aircraft, Inc, U.S. Bankruptcy Court Dist. Oregon Case No. 14-36770-rld11 (the "EVA Case"), and referenced in the Global Settlement Term Sheet filed as Docket No. 74 in the EVA Case (the "EVA Settlement"), but excluding any claims the Seller has against the Museum for unpaid property taxes.

1.7     Excluded Liabilities. Except for the Assumed Liabilities, the Buyer shall assume no other debts, liabilities, or obligations of the Seller.

# ARTICLE 2
# CLOSING

2.1     Closing. The consummation of the transactions provided for herein shall take place at the office of Motschenbacher & Blattner, LLP, 117 SW Taylor Street, Suite 300, Portland, Oregon, (the "Closing"). Upon request of the Buyer, the Closing shall occur via mail. The Closing shall be held as soon as the conditions to Buyer's and Seller's obligations under this Agreement have either been satisfied or waived and on a date mutually agreed to between Buyer and Seller (the "Closing Date") but in no event later than July 7, 2016 (the "Outside Date"). Notwithstanding anything to the contrary herein, the Parties may mutually agree in writing to an extended Outside Date. Until this Agreement is either terminated in accordance with its terms or the Closing occurs, the Parties shall diligently continue to work toward satisfaction of all conditions to Closing and the transaction contemplated herein shall close as soon as such conditions are satisfied or waived.

2.2     Conditions to Closing.

        (a)     The obligations of the Buyer and the Seller under this Agreement are subject to the satisfaction or waiver by the Buyer or the Seller, as applicable, of the following conditions precedent on or before the Closing:

                (i)     The Bankruptcy Court shall have entered an order approving the bidding procedures pursuant to which Seller shall sell the Purchased Assets to Buyer or a higher bidder (the "Bid Procedures Order") in a form reasonable acceptable to the Parties and otherwise substantially in the form set forth on Exhibit 2.2(a)(i).

                (ii)    The Seller shall have filed a motion or motions for approval ("Approval Motion") under Sections 363 and 365 of the Bankruptcy Code of (1) the sale of the Purchased Assets and assumption and assignment of the Assigned Contracts and assumption of the Assumed Liabilities pursuant to the terms of this Agreement and the transactions hereunder (the "Transaction"); (2) the sale of the Purchased Assets to the Buyer free and clear of liens, claims and interests, to the fullest extent possible under Section 363(f) of the Bankruptcy Code; and (3) the form of this Agreement;

                (iii)   The Bankruptcy Court shall have entered a Sale Order in a form reasonably acceptable to both parties hereto, which Sale Order must be final and non-appealable and shall include the findings described in Section 8.2 below and Buyer shall be the successful bidder at auction for the Purchased Assets

                (iv)    No court order shall have been entered in any action or proceeding, including the Bankruptcy Case, instituted by any person that enjoins, restrains, or prohibits the consummation of the transactions contemplated hereby; and

Page 4 of 31 – ASSET PURCHASE AGREEMENT

(v)     All collateral agreements referenced in this Agreement shall have been executed, subject to Closing, in form acceptable to the Parties.

(b)     The obligations of Buyer under this Agreement are subject to the satisfaction, or waiver by Buyer, of the following further condition's precedent on or before Closing:

(i)     The representations and warranties of the Seller contained herein shall be true in all material respects on and as of the Closing;

(ii)     The Seller shall, in all material respects, have performed all of their respective obligations and agreements and complied with all of its respective covenants contained in this Agreement to be performed and complied with by it on or prior to the Closing;

(iii)     No material adverse change shall have occurred with respect to the Assets.

(iv)     Seller shall have delivered to Buyer Seller's deliverables set forth below;

(v)     Title to the real to be conveyed shall be good and marketable in accordance with the provisions of Section 2.5 below;

(vi)     Buyer shall be reasonably satisfied with the form and content of the easements described in Exhibit A and the legal description to be attached to the Deed in Exhibit 2.3(b);

(vii)     Buyer shall be reasonably satisfied with condition of the Purchased Assets;

(viii)     All other conditions of this Agreement shall be met to Buyer's reasonable satisfaction.


(c)     The obligations of Seller under this Agreement are subject to the satisfaction, or waiver by Seller, of the following further conditions precedent on or before Closing:

(i)     The representations and warranties of the Buyer contained herein shall be true in all material respects on and as of the Closing;

(ii)     Seller has received sufficient funds from the sales of the Purchased Assets and the Remaining Assets, pursuant to the auction procedures described in the in the Bid Procedures Order, to pay all of Seller's secured creditors, all taxes due to Yamhill County accrued through the Closing Date and United States Trustee fees in full;

(iii)     Buyer shall have delivered to Seller Buyer's deliverables set forth below; and

(iv)     The Buyer shall, in all material respects, have performed all of its obligations and agreements and complied with all of its covenants contained in this Agreement to be performed and complied with by it on or prior to the Closing.

2.3     The Seller's Deliverables. At the Closing, the Seller shall deliver to the Buyer the following:

(a)     A Bill of Sale substantially in the form of Exhibit 2.3(a) attached hereto;

(b)     Instruments of transfer necessary, if any, to adjust the property lines to match the diagram attached hereto as Exhibit B.

(c)     Bargain and Sale Deeds substantially in the form of Exhibit 2.3(c) attached hereto;

(d)     Recordable easement(s) in favor of Buyer, for 1) full and free use of the parking lot currently associated with the Water Park, and 2) full and free use of the access road to the Water Park, to the extent it crosses real property that is part of the Remaining Assets sold or retained by Seller (together, the "Buyer Easements").

(e)     A certificate from a duly designated representative of the Seller certifying (i) the resolutions of the Trustees of the Seller approving and authorizing the execution of this Agreement and the transactions contemplated hereby and the taking of any and all actions deemed necessary or advisable to consummate the transactions contemplated herein; and (ii) compliance of the Seller with Sections 2.2(b)(i) and 2.2(b)(ii);

(f)     Other instruments of transfer reasonably required by the Buyer to evidence the transfer of the Purchased Assets to the Buyer, including, without limitation, titles to vehicles or mobile equipment being acquired, if any, and assignments with respect to any Intellectual Property registered, recorded or filed with any governmental authority, in form suitable for registration, recordation or filing with such governmental authority, in each case duly executed by the Seller.

2.4     The Buyer's Deliverables. At the Closing, the Buyer shall deliver to the Seller the following:

(a)     The Purchase Price;

(b)     Recordable easement(s) in favor of Seller, for 1) full and free access to adjoining parcels retained by Seller, and 2) use of one-half of the parking spaces behind the Space Museum, to the extent allowed by local authorities and on an intermittent use basis (the "Seller Easements").

(c)     A certificate from a duly elected officer of the Buyer certifying (i) the resolutions of the Board of Directors of the Buyer approving and authorizing the execution of this Agreement and the transactions contemplated hereby and the taking of any and all actions

deemed necessary or advisable to consummate the transactions contemplated herein; and (ii) compliance of the Buyer with Sections 2.2(c)(i), 2.2(c)(iii).

2.5    Title Insurance.   At Closing, Seller shall provide to Buyer an irrevocable commitment from Ticor to issue a standard coverage owner's title insurance policy in the amount of $4,200,000.00, insuring title for the real property to be conveyed hereunder vested in Buyer (the "Title Policy"), subject only to standard printed exceptions to such title insurance policies, including, without limitation, exceptions relating to (i) taxes or assessments which are not shown as an existing lien, (ii) facts that could be disclosed by an inspection, (iii) easements, water rights or other rights not of public record, (iv) lien for services not of public record, or (v) discrepancies, conflicts in boundary lines, encroachments or other facts that would be disclosed by a correct survey. At Closing, Seller shall pay for the cost of a standard policy, and Buyer shall pay for the costs of any additional extended coverage and endorsements that he desires.

2.6    Adjustments.   Seller shall pay for the standard coverage title insurance policy, one-half of all escrow fees and costs, any real property transfer or excise taxes, preparation of easements, any and all survey work associated with the transactions contemplated herein, and Seller's share of prorations pursuant to Section 2.7 below.  Buyer shall pay for one-half of escrow fees, recording charges related to the real property conveyed, extended coverage and endorsement premiums for its title policy, and Buyer's share of prorations pursuant to Section 2.7 below.  Buyer and Seller shall each pay their own legal and professional fees of other consultants hired by Buyer and Seller, respectively.  All other costs and expenses shall be allocated between Buyer and Seller in accordance with Yamhill County, Oregon practice  At Closing, Buyer shall contribute any additional funds necessary to pay their share of adjustments.

2.7    Prorations.

(a)    Operating Expenses.   All costs and expenses with respect to the operation and maintenance of the real property conveyed to Buyer under this Agreement (collectively, "Operating Expenses") are the responsibility of the Museum, which is the Seller's tenant. The Museum will become Buyer's tenant under the leases in effect for the Water Park and the Space Museum. To the extent utility accounts are not in the Museum's name, Buyer shall take all steps necessary to effectuate the transfer of all utilities to Buyer's name as of the date of the Closing, and where necessary, open a new account in Buyer's name and post deposits with the utility companies.  To the extent utility accounts are not in Buyer's name, Buyer and Seller shall cooperate to have all utility meters read by the appropriate utility companies as of the Closing Date. If Buyer and Seller are unable to obtain final meter readings as of the Closing Date from all applicable meters, such expenses shall be estimated at Closing based upon the operating history of the real property conveyed herein, subject to the final adjustment in all events no later than 60 days following the Closing. Seller shall be entitled to recover any and all deposits held by any utility companies as of the Closing Date, and if any such deposits are not returned to Seller on or before the Closing Date and are assigned to Buyer, such amounts shall be delivered to Seller no later than 75 days following the Closing.

(b)    Method of Proration.   Except as otherwise provided in this Agreement, all prorations shall be made in accordance with customary practice in Yamhill County, Oregon

except as provided herein. Such prorations, if and to the extent known and agreed on as of the Closing Date, shall be paid by Buyer to Seller (if the prorations result in a net credit to Seller) or by Seller to Buyer (if the prorations result in a net credit to Buyer) by increasing or reducing the cash to be paid by Buyer at closing. Any such prorations not determined or not agreed on as of the Closing Date shall be paid by Buyer to Seller, or by Seller to Buyer, as the case may be, in cash as soon as practicable following the Closing Date, but in any event within30 days after demand by the other party accompanied by documentation evidencing the amount due.

## ARTICLE 3
## SELLER'S REPRESENTATIONS AND WARRANTIES

The Seller represents and warrants to the Buyer as follows:

3.1     <u>Power</u>. Subject only to the applicable provisions of the Bankruptcy Code and entry of the Sale Order (if the Bankruptcy Case is open at the Closing), the Seller has all requisite corporate power and authority to execute, deliver and perform this Agreement and all writings relating hereto.

3.2     <u>Condition and Sufficiency of Purchased Assets</u>. Neither Seller, nor any of its respective trustees, directors, officers, employers, agents or representatives has made, or shall be deemed to have made, and no such person shall be liable for, or bound in any manner by, and Buyer has not relied upon and will not rely upon, any express or implied representations, warranties, guaranties, promises or statements pertaining to the Purchased Assets, except as specifically set forth in this Article 3. **THE SELLER HEREBY EXPRESSLY DISCLAIMS AND NEGATES ANY OTHER REPRESENTATION OR WARRANTY, OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE ASSETS AND RELATING TO THE OPERATIONS OF THE SELLER, AND SPECIFICALLY DISCLAIM ANY IMPLIED OR EXPRESS REPRESENTATION OR WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OR MATERIALS, OR THE ABILITY OF THE SELLER TO ASSIGN THE ASSETS, OR OBTAIN CONSENTS TO ANY ASSIGNMENT. ALL OF THE ASSETS ARE BEING SOLD "AS IS", "WHERE IS" AND "WITH ALL FAULTS."**

3.3     <u>Existing Lease Agreements</u>. Attached hereto as <u>Exhibit C-1</u> is a true and correct copy of the existing lease agreement, with any amendments thereto, by and between Seller and the Museum with respect to the Water Park. Attached hereto as <u>Exhibit C-2</u> is a true and correct copy of the existing lease agreement, with any amendments thereto, by and between Seller and the Museum with respect to the Space Museum. Seller has no knowledge any agreement with the Museum that would modify or waive the prohibition on subleasing or assignment of the existing leases.

## ARTICLE 4
## BUYER'S REPRESENTATIONS AND WARRANTIES

The Buyer represents and warrants to the Seller as follows:

4.1     Organization. Buyer is an individual residing in the state of Maine, and his assignee, if any, will be a duly organized business entity in good standing in the state of Maine.

4.2     Authority. The Buyer or his assignee have all requisite power and authority to enter into this Agreement and to perform its respective obligations hereunder.  Prior to Closing, the execution, delivery and performance of this Agreement will have been duly and validly authorized and ratified by all necessary corporate and other action on the part of the Buyer or his designee, and no other proceedings on the part of the Buyer or his designee are necessary to authorize this Agreement and the transactions contemplated hereby.

4.3     Validity. Assuming due authorization, execution and delivery of this Agreement by the Seller, and assuming Bankruptcy Court approval and authorization (if necessary), this Agreement constitutes a valid and binding obligation of the Buyer, enforceable in accordance with its terms. Upon execution and delivery thereof by Buyer at Closing (and assuming due authorization, execution and delivery thereof by Seller and any necessary Bankruptcy Court approval and authorization thereof), this Agreement will be the valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

4.4     Disclaimer. The Buyer acknowledges that in making the decision to enter into this Agreement and to consummate the transactions contemplated hereby, the Buyer has relied solely on the basis of its own independent investigation of the Purchased Assets and upon the express written representations, warranties and covenants in this Agreement.

## ARTICLE 5
## INDEMNIFICATION

5.1     Indemnity by the Buyer. The Buyer agrees to indemnify and hold harmless the Seller, its Affiliates, and each of its respective officers, directors, and employees, from and after the Closing, against any and all losses damages, liabilities, claims, deficiencies, costs, expenses, and expenditures, including, without limitation, reasonable attorney's fees and court and investigation costs (collectively, the "Indemnity Losses") arising with respect to each of the following events (the "Buyer Events"):

(a)     any sales or use tax liability arising out the transfer of the Purchased Assets to the Buyer;

(b)     any liability or obligation of the Seller expressly assumed by the Buyer pursuant to this Agreement;

(c)     the breach by the Buyer of any of its representations and warranties under this Agreement; or

(d)     the failure by Buyer to perform any of the covenants to be performed by the Buyer under this Agreement.

5.2     Indemnification by Seller.  The Seller agrees to indemnify and hold harmless the Buyer, from and after the Closing, against any and all Indemnity Losses arising with respect to the following events (the "Seller Events"):

(a)     the breach by the Seller of any of its respective representations and warranties under this Agreement;

(b)     the failure by the Seller to perform any of its respective covenants under this Agreement;

(c)     any liability or obligation of the Seller retained by the Seller pursuant to this Agreement; or

(d)     claims by the Museum that would have a material adverse effect on Buyer's use of the Purchased Assets.

5.3     Limitations on Indemnities.  The obligations of indemnity provided above in Sections 5.1 and 5.2 are subject to the following terms, conditions and limitations:

(a)     The aggregate obligation of indemnity of the Buyer and Seller pursuant to Sections 5.1 and 5.2 shall not exceed the amount of the Purchase Price; and

(b)     The obligations of indemnity described in Sections 5.1 and 5.2 shall survive the Closing Date for two (2) year(s); provided, however, that obligations for indemnity for tax matters shall survive until the applicable statute of limitations for such tax obligation expires. Each Buyer Event and the Seller Event is an Indemnity Event, and the Buyer Events and Seller Events are collectively referred to as the Indemnity Events.

5.4     Notice of Indemnity Claim.  If Seller seeks indemnity hereunder Seller promptly notify the Buyer in accordance with the notice terms of this Agreement, of the Indemnity Event in question after the Seller becomes aware of the existence of such Indemnity Event specifying with reasonable particularity the basis for such Indemnity Event; provided, that the failure so to timely notify shall relieve the Buyer from the obligation to indemnify against the liability respecting such Indemnity Event only to the extent that a court with appropriate jurisdiction has determined in a final order that the Buyer has established by competent evidence that it is prejudiced thereby. In any case, if any such action giving rise to an Indemnity Event shall be brought, and the Seller shall promptly notify the Buyer of the commencement thereof, Seller shall be entitled to participate in the defense thereof at its own expense. Whether or not the Seller chooses to participate in the defense or prosecution of any claim, action, suit or proceeding with respect to an Indemnity Event, all the parties hereto shall cooperate in the defense or prosecution thereof.

If Buyer seeks indemnity hereunder Buyer shall promptly notify the Seller in accordance with the notice terms of this Agreement, of the Indemnity Event in question after the Buyer becomes aware of the existence of such Indemnity Event specifying with reasonable particularity the basis for such Indemnity Event; provided, that the failure so

to timely notify shall relieve the Seller from the obligation to indemnify against the liability respecting such Indemnity Event only to the extent that a court with appropriate jurisdiction has determined in a final order that the Seller has established by competent evidence that it is prejudiced thereby. In any case, if any such action giving rise to an Indemnity Event shall be brought, and the Buyer shall promptly notify the Seller of the commencement thereof, Buyer shall be entitled to participate in the defense thereof at its own expense. Whether or not the Buyer chooses to participate in the defense or prosecution of any claim, action, suit or proceeding with respect to an Indemnity Event, all the parties hereto shall cooperate in the defense or prosecution thereof.

5.5   Sole Remedy. Except for fraud, the sole remedy of the Seller for breach of the representations and warranties set forth in Articles 4 shall be pursuant to this Article 5.


# ARTICLE 6
# TAX MATTERS

6.1   Certain Taxes Other Than Federal, State and Local Income Taxes . Except as otherwise provided elsewhere herein, all sales, use, stamp, and registration taxes incurred in connection with this Agreement and arising out of the transfer of the Purchased Assets to Buyer, but excluding income taxes of Seller, shall be paid by the Buyer when due, and the Buyer shall, at its own expense, file all necessary tax returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other such taxes and fees, and, if required by applicable law, the Seller shall join in the execution of any such tax returns and other documentation. The parties shall cooperate with one another in the preparation of all tax returns, questionnaires, applications or other documents regarding any taxes or transfer, recording, registration or other fees which become payable in connection with the transactions that are required to be filed on or before the Closing.

6.2   Preparation and Filing of Certain Tax Forms.

(a)   Section 1.2 sets forth the allocation of the deemed sales price of the Purchased Assets, in accordance with the allocation requirements of Section 1060 of the Internal Revenue Code (the allocation agreed on by the parties pursuant to Section 1.2, the "Purchase Price Allocation Agreement").

(b)   For all tax purposes, Buyer and Seller agree to report the transactions contemplated in this Agreement in a manner consistent with the Purchase Price Allocation Agreement, and Buyer and Seller shall not voluntarily take any action inconsistent with the Purchase Price Allocation Agreement or take a position inconsistent therewith in any tax return, refund claim, litigation or otherwise unless required pursuant to a determination (as defined in Section 1313(a) of the Code or any similar state or local tax provision) or by any governmental authority. Buyer and Seller shall each be responsible for the preparation of their own IRS Forms 8594 (and any corresponding or similar forms or reports required under state or other applicable tax laws) in accordance with applicable tax laws, and each shall execute and deliver to each other

such statements and forms as are reasonably requested by the other party, and in accordance with the Purchase Price Allocation Agreement.

## ARTICLE 7
## ADDITIONAL COVENANTS

7.1     Aircraft Display. Notwithstanding any other provisions of this Agreement, Buyer shall maintain the "Display Planes" listed on Exhibit A (except the Corsair FG-1D (N67HP), and the P-51D Mustang, (N51HD)) or suitable replacement aircraft (determined in Buyer's sole discretion) at their current location in McMinnville, Oregon, for so long as the Museum remains open to the public, operational, and is able to pay its debts and expenses as they become due.

7.2     Water Park and Space Museum Leases.  Buyer shall lease to the Museum the Space Museum and the Water Park under terms consistent with the EVA Settlement.

7.3     Assignment of Contracts and Claims. Notwithstanding any other provision of this Agreement, nothing in this Agreement or any related document shall be construed as an attempt to assign (a) any contract which, as a matter of law or by its terms, is nonassignable without the consent of the other parties thereto unless such consent has been given or unless such consent is not required by the Bankruptcy Code or (b) any contract or claim as to which all of the remedies for the enforcement thereof enjoyed by Seller would not, as a matter of law or by their terms, pass to Buyer as an incident of the transfers and assignments to be made under this Agreement.

7.4     Conveyance of Purchased Assets

(a)     At or prior to Closing, Seller shall execute any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things as are reasonably necessary to transfer, vest, perfect or confirm right, title, interest or ownership (of record or otherwise) of the Purchased Assets, as requested by Buyer.

(b)     If at any time after the Closing, either Party is advised that any additional deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are reasonably necessary to vest, perfect or confirm the other party's ownership (of record or otherwise), right, title or interest in, to or under any or all of the Purchased Assets or otherwise to carry out the intent of this Agreement, the Parties shall use reasonable best efforts to execute and deliver all deeds, bills of sale, instruments of conveyance, assignments and assurances and take and do all such other actions and things as may be reasonably requested by the other Party in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the appropriate Party or otherwise to carry out this Agreement.

7.5     Preservation of Purchased Assets and No Material Changes in Purchased Assets. Except as otherwise may be ordered by the Bankruptcy Court, Seller shall preserve the Purchased Assets in the ordinary and usual course of business, consistent with prior practices. Except as otherwise may be ordered by the Bankruptcy Court, no action shall be taken by Seller that shall effect the Purchased Assets in any material adverse respect, or Buyer's use or operation of the assets after the Closing.

Page 12 of 31 – ASSET PURCHASE AGREEMENT

7.6     Use of Property by School District.  The Buyer intends to continue the obligations pursuant to the Memorandum of Understanding (the "MOU") between the Museum and the McMinnville School District #40 (the "School District"), an unsigned copy of which is attached hereto as Exhibit 7.7.  The Buyer shall not be responsible for any legal action between the Museum, the School District and/or Seller related to the MOU.

7.7     501(c)(3) Status.  Buyer and Seller shall make a reasonable effort to ensure that Seller maintains its 501(c)(3) status, including the execution of any and all documentation.

7.8     Donation to Non-Profit Organization.  Nothwithstanding anything to the contrary in this Agreement, Buyer shall not be prohibited from donating the Purchased Assets purchased hereunder to a non-profit organization, provided that the Buyer's donee assumes the obligations regarding "Aircraft Display" as set forth in this Article 7.

## ARTICLE 8
## BANKRUPTCY MATTERS

8.1     Seller and Buyer acknowledge that Seller is currently the debtor in the Bankruptcy Case, and, as such, this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that, to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court. Seller and Buyer acknowledge that in connection with Seller's efforts to obtain the highest or otherwise best offer possible for the Purchased Assets, Seller may engage a financial advisor, broker or other professional to market the Purchased Assets to other potential buyers.  Further, the Seller and Buyer acknowledge that the Seller shall proceed with an auction process for the sale of the Purchased Assets.

8.2     Seller has filed or will file with the Bankruptcy Court a motion (the "Sale Motion"), notices and proposed orders, in form and content reasonably satisfactory to Buyer seeking the Bankruptcy Court's issuance of the Sale Order.  The Sale Motion shall include a request that the Sale Order include, among other things:

        (a)     that this Agreement was negotiated at arms-length, and the Buyer has acted in good faith and without collusion or fraud of any kind;

        (b)     the Buyer is not an "insider" or "affiliate" of the Seller as those terms are defined in the Bankruptcy Code;

        (c)     neither the Seller nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of Section 363(n) of the Bankruptcy Code with respect to the consummation of the purchase transaction;

(d)     Buyer is purchasing the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections afforded by Section 363(m) of the Bankruptcy Code;

(e)     notice of the sale (and any required sale procedures), as sent to all creditors and interested parties, is sufficient to comply with notice requirements of the Bankruptcy Code; and

(f)     all objections to the sale free and clear of liens, claims, interests and encumbrances have been withdrawn or overruled, and the Buyer therefore purchases the Purchased Assets free and clear of all liens, claims, interests and encumbrances, including free and clear of the Liens and Liabilities, other than Permitted Liens and Assumed Liabilities.

(g)     If the Purchased Assets are sold pursuant to the Sale Order, but the Buyer is not the successful purchaser, from the proceeds received by Seller from such sale to such successful purchaser, Buyer will be entitled to a cash payment in an amount equal to its reasonable costs and fees incurred in the negotiation and pursuit of this transaction, as described in an itemization provided by the Buyer, not to exceed $100,000 (the "Break-Up Fee") and a return of the Deposit. For the avoidance of doubt, the Break-Up Fee shall be paid to Buyer only if the Buyer is outbid at the auction, and a sale of the Purchased Assets is consummated to a party other than the Buyer.   Furthermore, the Break-Up Fee shall not be paid to the Buyer in the event of a foreclosure sale of any of the Purchased Assets, if the Bankruptcy Case is converted to Chapter 7, or if the Bankruptcy Case is dismissed.

8.3     Seller shall serve a copy of the Sale Motion on:

(a)     all entities that claim any interest in or Lien (other than Permitted Liens) upon the Purchased Assets;

(b)     all parties to Assigned Contracts;

(c)     all governmental taxing authorities that have or as a result of the sale of the Purchased Assets may have claims, contingent or otherwise, against the Seller;

(d)     all parties that filed requests for notices under Bankruptcy Rule 901(b) or were entitled to notice under Bankruptcy Rule 2002;

(e)     all creditors or holders of claims (as defined in Section 101(5) of the Bankruptcy Code, whether or not liquidated, contingent, disputed, or unmatured) of the Seller;

(f)     all interested governmental, pension, environmental and other regulatory entities;

(g)     the Attorney General of the State of Oregon;

(h)     the Office of the United States Trustee;

(i)     the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Seller; and

(j)     all entities that expressed to the Seller an interest in purchasing the Purchased Assets.

8.4     Seller shall provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders) directly relating to the Purchased Assets or this Agreement prior to the filing thereof in the Bankruptcy Case so as to allow Buyer to provide reasonable comments for incorporation into same.

8.5     The Seller has filed or will within 3 business days file with the Bankruptcy Court a motion seeking approval of a bidding process. The Bankruptcy Court order approving such bidding process shall include the following, without limitation:

(a)     Competing bidders will be required to pay the Break-Up Fee and overbid in $25,000.00 increments above the bid submitted by the Buyer; Buyer shall have the right but not the obligation to overbid competing bids in $25,000.00 increments;

(b)     Competing bidders must demonstrate when bidding the ability to pay the amount bid in cash at the Closing;

(c)     Competing bidders (other than the Buyer) will be required to deliver to Seller a signed copy of this Agreement, marked to show such bidder's proposed changes, in order to confirm a commitment to proceed with the purchase.

## ARTICLE 9
## TERMINATION

9.1     <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing Date:

(a)     By mutual written consent of the Buyer and the Seller;

(b)     By either the Buyer or the Seller:

(i)     if the Bankruptcy Court denies the Sale Motion, materially revises the terms of the proposed Sale Order, or orders the sale of the Purchased Assets to a third party;

(ii)     if the Buyer is not the successful bidder at the auction of the Purchased Assets, and a sale of the Purchased Assets is consummated with a party that is not the Buyer or his assignee;

(iii)     if the Closing shall not have occurred on or before the Outside Date, by reason of the failure of any condition precedent, or unless the failure to consummate the transactions is the result of a material breach of this Agreement by the party seeking to terminate this Agreement,

(c)     By the Buyer if the Seller breaches any of its representations and warranties in any material respect herein or fails to perform in any material respect any of its covenants, agreements, or obligations under this Agreement, and any such breach or failure is not cured within ten (10) days after written notice from the Buyer; or

(d)     By the Seller if the Buyer breaches any of its representations or warranties in any material respect herein or fails to perform in any material respect any of its covenants, agreements, or obligations under this Agreement, and any such breach or failure is not cured within ten (10) days after written notice from the Seller.

9.2     Effect of Termination. In the event of termination of this Agreement by either the Seller or the Buyer as provided in Section 9.1. this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of the Seller or the Buyer, except (a) to the extent that such termination results from the breach by a party of any of its representations, warranties, covenants or agreements set forth in this Agreement as contemplated by Sections 9.1(c) and 9.1(d), or (b) to the extent the Bankruptcy Court orders the enforcement of this Agreement on its terms in the event the Buyer fails to close at Closing once the Bankruptcy Court has approved the Transaction and this Agreement pursuant to the Sale Order.

## ARTICLE 10
## GENERAL

10.1     Access to Records and Properties; Assistance. For a period of seven (7) years following the Closing, the Seller shall afford Buyer reasonable access to the financial and tax records of the Seller as well as the properties related to the Seller to (a) complete any financial statements or audits thereof or tax returns, (b) defend any tax disputes or claims or respond to any requests in connection with any tax audits, (c) comply with any legal request or order, (d) defend any disputes, claims, prosecution or litigation, or (e) for any other reasonable purpose.

10.2     Assignment. This Agreement and the rights of the parties hereunder may not be assigned (except by operation of law) and shall be binding upon and shall inure to the benefit of the parties hereto and the successors to the parties hereto, provided, however, that Seller and Buyer may assign their respective rights hereunder to any of their respective direct or indirect wholly owned Subsidiary or subsidiaries.

10.3     Signatures. Signatures on this Agreement delivered by fax or telecopier shall be considered original signatures for purposes of effectiveness of this Agreement.

10.4     Counterparts. This Agreement may be executed simultaneously in two or more counterparts which may be delivered by facsimile, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

10.5     Fees and Expenses. Whether or not the transactions herein contemplated shall be consummated, (a) the Seller will pay the fees, expenses and disbursements of the Seller, and its agents, representatives, accountants and counsel incurred in connection with the subject matter of

this Agreement and any amendments thereto, and (b) the Buyer will pay the fees, expenses and disbursements of the Buyer and its agents, representatives, accountants and counsel incurred in connection with the subject matter of this Agreement and any amendments hereto.

10.6    Counsel. Each party hereto warrants and represents that such party has been afforded the opportunity to be represented by counsel of its choice in connection with the execution of this Agreement and has had ample opportunity to read, review and understand the provisions of this Agreement.

10.7    Notices. Any notice or communication required or permitted hereunder shall be sufficiently given if sent by first class mail, postage prepaid:

      (a)     If to the Seller, addressed to it at:

           Michael King Smith Foundation
           Attn: Lisa Anderson
           22111 Riverwood Rd.
           Dundee, OR 97115
           lisa.anderson@greenpatchfarms.com

      (b)     With a copy to its counsel, which shall not constitute formal notice, at:

           Motschenbacher & Blattner, LLP
           Attn: Nicholas J. Henderson
           117 SW Taylor Street, Suite 300
           Portland, OR 97204
           nhenderson@portlaw.com

      (c)     If to the Buyer, addressed to:

           Affordable Mid Coast Housing, LLC
           PO Box 9340
           Auburn, ME 04210

10.8    Opportunity to Investigate. All of the parties have had an opportunity to investigate and evaluate the Purchased Assets being purchased, have relied on independent professional advice and, therefore, agree that the price to be paid by the Buyer for the Purchased Assets is reasonably equivalent value for the Purchased Assets.

10.9    Governing Law and Jurisdiction. THIS AGREEMENT (AND ALL DOCUMENTS, INSTRUMENTS, AND AGREEMENTS EXECUTED AND DELIVERED PURSUANT TO THE TERMS AND PROVISIONS HEREOF (THE "ANCILLARY DOCUMENTS") SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE INTERNAL LAWS OF THE STATE OF OREGON WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF. THE

BUYER AND THE SELLER FURTHER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (A) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT AND (B) THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES. BUYER CONSENTS TO AND EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION; *PROVIDED, HOWEVER*, THAT IF THE BANKRUPTCY COURT REFUSES TO ACCEPT JURISDICTION OVER ANY SUCH DISPUTE, THEN ANY STATE OR FEDERAL COURT LOCATED IN THE COUNTY OF YAMHILL, STATE OF OREGON SHALL HAVE JURISDICTION OVER SUCH DISPUTE AND BUYER AND THE SELLER HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT IN ANY SUCH CASE.

10.10  Oregon Statutory Disclaimer. THE PROPERTY DESCRIBED IN THIS INSTRUMENT MAY NOT BE WITHIN A FIRE PROTECTION DISTRICT PROTECTING STRUCTURES. THE PROPERTY IS SUBJECT TO LAND USE LAWS AND REGULATIONS THAT, IN FARM OR FOREST ZONES, MAY NOT AUTHORIZE CONSTRUCTION OR SITING OF A RESIDENCE AND THAT LIMIT LAWSUITS AGAINST FARMING OR FOREST PRACTICES, AS DEFINED IN ORS 30.930, IN ALL ZONES.  BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, AND SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.  BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO VERIFY THE EXISTENCE OF FIRE PROTECTION FOR STRUCTURES AND TO INQUIRE ABOUT THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

10.11  Conflicts. In case any material provision in this Agreement shall conflict with any part of the Sale Order, the Buyer shall have the right to terminate this Agreement and be promptly refunded the Deposit.

10.12  Captions. The captions in this Agreement are for convenience only and shall not be considered a part hereof or affect the construction or interpretation of any provisions of this Agreement.

10.13  Entire Agreement. This Agreement and the documents delivered pursuant hereto constitute the entire agreement and understanding between the Seller and the Buyer and supersede any prior agreement and understanding relating to the subject matter of this

Agreement. This Agreement may be modified or amended only by a written instrument executed by the Seller and the Buyer acting through their duly elected officers.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

[Balance of Page Intentionally Left Blank]

SELLER.                                BUYER:

**Michael King Smith Foundation**        **Affordable Mid Coast Housing, LLC**

By: _____          _____
Name: Lisa Anderson                    Name: George P. Schott
Title: Trustee                         Title: Member

Page 20 of 31 – ASSET PURCHASE AGREEMENT

# EXHIBIT A
# PURCHASED ASSETS

**Display planes (8 total)**
- Corsair FG-1D, N67HP
- P-51D Mustang, N51HD
- Canso PBY 5-A
- Cassutt Racer
- Ryan NYP - Spirit of St. Louis
- FW-190A Replica
- Ryan ST3KR #2161
- Douglas DC-3A-S1C3G, N16070

**Artifacts**
- Mark Hatfield Sculpture
- Rory Sculpture
- JN4 Curtis
- Victor Atiyeh Sculpture
- By the Seat of His Pants
- 1931 Ford Model A
- Mars Exploration Rover

**Buildings**
- Space Museum
- Water Park
- Chapel, subject to a mutually agreeable lease or easement in favor of Seller.

**Land**
- Tax Lot 600, as modified through lot line adjustments to match the property shown on attached Exhibit B, and all improvements thereon, including the Water Park Building and Space Museum Building,.
- The "Chapel" currently located where designated on Exhibit B.
- Easements from Seller to Buyer for:
  - Use of the portions of Tax Lot 1300 that consist of the parking lot associated with the Water Park, and the access road to the Water Park parking lot, as designated on Exhibit B;
- Easements from Buyer to Seller for:
  - Full and free access to the Chapel
  - Full and free access to adjoining parcels retained by Seller;
  - Use ½ of the parking spaces behind the Space Building to the extent allowed by local authorities and on an intermittent use basis;

**Furniture and equipment**
- All items belonging to Seller currently located anywhere on the Campus (but excluding MKS historic bedroom display); All Water Park rides, equipment, machinery, and equipment.

{00289001.DOC; 2}

**EXHIBIT B**

# Evergreen Property Reconfiguration



1: Chapel: easement to be granted to Seller;
2: Access road and parking lot to be retained by Seller, with easement to be granted to Buyer.

**EXHIBIT C-1**

**EXISTING WATER PARK LEASE AND AMENDMENTS**

{00289001.DOC; 2}

# LEASE

### Between

## THE MICHAEL KING SMITH FOUNDATION

### and

## EVERGREEN AVIATION AND SPACE MUSEUM AND THE CAPTAIN MICHAEL KING SMITH EDUCATIONAL INSTITUTE

**Effective Date:** June 1 , 20 11

# TABLE OF CONTENTS

Page

ARTICLE 1.        AGREEMENT TO LEASE ................................................................... 1

ARTICLE 2.        PREMISES ................................................................................ 1
    Section 2.1    Description ................................................................................1
    Section 2.2    Permitted Use and Compliance with All Laws..................................1
    Section 2.3    Limits on Use ............................................................................2
    Section 2.4    Permitted Accessory Uses............................................................2
    Section 2.5    Condition of Property/No Warranties..............................................2
    Section 2.6    Signage.....................................................................................2
    Section 2.7    Overloading of Floors ..................................................................3

ARTICLE 3.        TERM AND EXTENSION OPTIONS ...................................................... 3

ARTICLE 4.        RENT ....................................................................................... 3
    Section 4.1    Base Rent .................................................................................3
    Section 4.2    Security Deposit..........................................................................3

ARTICLE 5.        LESSEE OBLIGATIONS .................................................................. 4
    Section 5.1    Repairs and Maintenance .............................................................4
    Section 5.2    Utilities....................................................................................4
    Section 5.3    Taxes ......................................................................................5
    Section 5.4    Operating Covenants....................................................................5

ARTICLE 6.        LESSEE'S OTHER OBLIGATIONS........................................................ 5
    Section 6.1    Construction of Improvements .......................................................5
    Section 6.2    No Liens...................................................................................5
    Section 6.3    Access to Premises......................................................................5
    Section 6.4    Safety Requirements ...................................................................6

ARTICLE 7.        PARKING & SECURITY .................................................................. 6
    Section 7.1    Parking .....................................................................................6
    Section 7.2    Security ....................................................................................6

ARTICLE 8.        INSURANCE REQUIREMENTS........................................................... 6
    Section 8.1    Generally...................................................................................6
    Section 8.2    Certificates; Notice of Cancellation.................................................7
    Section 8.3    Additional Insured ......................................................................7
    Section 8.4    Primary Coverage .......................................................................7
    Section 8.5    Company Ratings.........................................................................7
    Section 8.6    Required Insurance ......................................................................7
    Section 8.7    Damage or Destruction of Premises ................................................8
    Section 8.8    Waiver of Subrogation..................................................................9

i – Waterpark Lease

ARTICLE 9.        DEFAULT .................................................................................. 9
    Section 9.1   Events of Default ...........................................................9
    Section 9.2   Remedies on Default......................................................10
    Section 9.3   No Waiver of Default.....................................................11
    Section 9.4   Remedies Cumulative and Nonexclusive ......................11
    Section 9.5   Curing Lessee's Default..................................................11
    Section 9.6   Administrative Costs......................................................12

ARTICLE 10.       TERMINATION ......................................................................... 12
    Section 10.1  Title to Lessee Improvements upon Termination ...........12
    Section 10.2  Lessee's Personal Property .............................................12
    Section 10.3  Time for Removal ..........................................................12
    Section 10.4  Holdover .........................................................................13
    Section 10.5  For Rent and For Sale ....................................................13

ARTICLE 11.       ENVIRONMENTAL OBLIGATIONS OF LESSEE............................ 13
    Section 11.1  Definitions.......................................................................13
    Section 11.2  Limited Business Use of Hazardous Substances ............14
    Section 11.3  Environmental Inspection ..............................................14
    Section 11.4  Environmental Safety.....................................................14
    Section 11.5  Disposal of Hazardous Substances ................................15
    Section 11.6  Notice to Lessor .............................................................15
    Section 11.7  Certification ....................................................................15
    Section 11.8  Documentation of Hazardous Substances......................15

ARTICLE 12.       INDEMNITIES............................................................................ 16
    Section 12.1  General Indemnity ..........................................................16
    Section 12.2  Environmental Indemnity ...............................................16
    Section 12.3  Survival ...........................................................................17
    Section 12.4  Scope of Indemnity ........................................................17

ARTICLE 13.       ASSIGNMENT AND SUBLETTING ............................................. 17

ARTICLE 14.       GENERAL PROVISIONS ............................................................ 17
    Section 14.1  Covenants, Conditions, and Restrictions .......................17
    Section 14.2  Condemnation..................................................................17
    Section 14.3  Nonwaiver.......................................................................17
    Section 14.4  Attorney Fees .................................................................18
    Section 14.5  Time of Essence..............................................................18
    Section 14.6  Warranties/Guarantees...................................................18
    Section 14.7  Headings .........................................................................18
    Section 14.8  Consent of Lessor ...........................................................18
    Section 14.9  Notices ............................................................................18
    Section 14.10 Governing Law ...............................................................19
    Section 14.11 Nonwaiver.......................................................................19
    Section 14.12 Survival ...........................................................................19
    Section 14.13 Partial Invalidity.............................................................20

ii – Waterpark Lease

Section 14.14  Modification.............................................................................20
Section 14.15  Successors................................................................................20
Section 14.16  Limitation on Liability..........................................................20
Section 14.17  No Light or View Easement.................................................20
Section 14.18  Calculation of Time..............................................................20
Section 14.19  Exhibits Incorporated by Reference...................................20
Section 14.20  Brokers....................................................................................20
Section 14.21  Successors; the Parties.........................................................21
Section 14.22  Interpretation of Lease; Status of Parties.........................21
Section 14.23  No Recordation of Lease.....................................................21
Section 14.24  Force Majeure.........................................................................21
Section 14.25  Capacity to Execute; Mutual Representations ................21

# DEFINITIONS

Page

Additional Rent .......................................................................................................... 3
Base Rent ................................................................................................................... 3
Building ...................................................................................................................... 1
Business Days ............................................................................................................ 20
Commencement Date .................................................................................................. 3
Common Areas ........................................................................................................... 1
Costs .......................................................................................................................... 16
Development ............................................................................................................... 1
Documents ................................................................................................................. 15
Environmental Costs .................................................................................................. 13
Environmental Laws ................................................................................................... 13
Event of Default ......................................................................................................... 9
Expiration Date .......................................................................................................... 3
Force Majeure Event .................................................................................................. 21
Hazardous Substances ................................................................................................ 13
Lease .......................................................................................................................... 1
Lease Term ................................................................................................................. 3
Legal holiday .............................................................................................................. 20
Lessee ........................................................................................................................ 1
Lessor ........................................................................................................................ 1
Permitted Use ............................................................................................................. 1
Personal Property ....................................................................................................... 12
Premises ..................................................................................................................... 1
Property ..................................................................................................................... 1
Rent ........................................................................................................................... 3
Waterpark .................................................................................................................. 1
Waterpark Systems ..................................................................................................... 4

# LEASE

THIS LEASE ("Lease") is effective as of the `1` day of `June`, 20`11`, by and between The Michael King Smith Foundation ("Lessor"), an Oregon trust, and Evergreen Aviation and Space Museum and The Captain Michael King Smith Educational Institute, an Oregon nonprofit corporation ("Lessee").

## ARTICLE 1.   AGREEMENT TO LEASE

Lessor owns certain real estate, located in the City of McMinnville, County of Yamhill and State of Oregon, including land and improvements, commonly known as the Evergreen Wings & Waves Waterpark, legally described on Exhibit A attached hereto (the "Property")* The Property is part of a larger development known as the Evergreen Aviation & Space Museum (the "Development"). Lessor hereby agrees to lease to Lessee, and Lessee hereby agrees to lease from Lessor, a portion of the Property as follows.

## ARTICLE 2.   PREMISES

### Section 2.1   Description

Lessor hereby leases to Lessee, on the terms and conditions stated below, a building consisting of approximately seventy-one thousand three hundred and fifty (71,350) square feet (the "Building"), together with all improvements located therein, or to be made thereto by either Lessor or Lessee (collectively the "Premises"). Included for use in conjunction with the Premises is a nonexclusive right of use of the Common Areas, including parking in the parking area. The "Common Areas" means and includes the driveways, access points, causeways, outdoor seating and playground, as depicted on Exhibit B attached hereto.

### Section 2.2   Permitted Use and Compliance with All Laws

Lessee shall use the Premises only for the following purpose(s): Operation of an educational waterpark and museum ("Waterpark") and accessory related uses to include a gift store and restaurant facilities as described herein ("Permitted Use"). No other use may be made of the Premises without the prior written approval of Lessor. At all times during this Lease, Lessee shall comply with all applicable laws, ordinances, rules and regulations of the state, federal, or local governments and all other government authorities with jurisdiction over the Premises. Lessee shall promptly provide to Lessor copies of all communications to or from any such government entity which relate to Lessee's noncompliance, or alleged noncompliance, with any laws or other government requirements impacting the Premises or the Common Areas. Lessee's nonexclusive use of the Common Areas shall include ingress and egress over paved driveways and the right for Lessee's guests, contractors and invitees to use the other Common Area amenities in a manner that does not unreasonably interfere with other tenants in the Development.

* The Property shall include all personal property located in the Building that is provided by Lessor and used in connection with the Premises, including but not limited to computers, printers, servers, lockers, tables, benches, digital signage, lifejackets, stands, educations displays, and concession and kitchen equipment; provided, however, Lessor may periodically elect to exclude any such personal property from this Lease by delivering notice of such exclusion to Lessee in the manner required hereunder.

1 – Waterpark Lease

### Section 2.3 Limits on Use

Lessee shall not use, nor permit anyone else to use, the Premises or permit anything to be done in the Premises that (a) adversely affects, or is likely to adversely affect, the Premises, the Property or any element or part of the Premises or the Property, or the operations of the Premises or the Property; (b) creates any condition that may be a safety hazard in violation of Section 6.4; (c) creates a condition that may increase the rate of fire insurance for the Premises or the Property or would prevent Lessor from taking advantage of any ruling of an insurance rating bureau that would allow Lessor to obtain reduced rates for its insurance policies, or violates any requirements of Lessee's insurance carrier; or (d) creates a hazard or a nuisance. Unless approved by Lessor, Lessee will not store gasoline or any other combustible materials on the Premises.

### Section 2.4 Permitted Accessory Uses

Lessor agrees that Lessee shall be allowed to enter into license/use agreements for all or a portion of the Premises on a short-term temporary basis with third parties for special events. All food and beverage services for such events must be provided by Lessee or a caterer who Lessee has verified is licensed to serve food to the public and all food is prepared and served in accordance with all legal requirements. Alcohol may only be brought onto and served on the Premises for any such event provided that a current license to serve alcohol is in place and is properly posted, as required by law, and service is made in accordance with all Oregon Liquor Commission Control regulations. Lessee shall be solely liable and responsible for the actions of any guests, invitees, licensees, sublessees, caterers, and other contractors, including their respective employees, guests, agents and contractors.

### Section 2.5 Condition of Property/No Warranties

Except as expressly set forth in this Lease, Lessor makes no warranties or representations regarding the condition of the Premises, the Property or the Development, including, without limitation, the suitability of the Premises for intended uses or the condition of the Building and other improvements. Lessee has inspected and accepted the Premises in "AS IS" condition upon taking possession. Lessor shall have no liability to Lessee, and Lessee shall have no claim against Lessor, for any damage or injury or loss of use caused by the condition of the Premises or the Property. Lessor shall have no responsibility to bring the Premises into compliance with any laws, including, without limitation, any building or occupancy codes, permit conditions, or certification requirements. Lessee shall be solely responsible for thoroughly inspecting the Premises and ensuring that it is in compliance with all laws. Lessee shall be solely responsible for ensuring that the Premises meets all requirements of the Americans With Disabilities Act and that all permitting and zoning requirements needed for Lessee's Permitted Use are in place and in full force and effect.

### Section 2.6 Signage

All signage must be pre-approved, in writing, by Lessor. Signage existing on the execution date of this Lease is hereby approved.

2 – Waterpark Lease

### Section 2.7    Overloading of Floors

Lessee will not overload the floors of the Premises in such a way as to cause any undue or serious stress or strain upon the Building, and Lessor shall have the right, at any time, to call upon any competent engineer or architect whom Lessor may choose to decide whether or not the floors of the Premises, or any part thereof, are being overloaded so as to cause any undue or serious stress or strain on the Building, or any part thereof, and the decision of the engineer or architect shall be final and binding upon Lessee; and in the event that it is the opinion of the engineer or architect that the stress or strain is such as to endanger or injure the Building, Lessee agrees immediately to relieve the stress or strain, either by reinforcing the Building, or by lightening the load which causes such stress or strain, in a manner satisfactory to Lessor.

## ARTICLE 3.    TERM AND EXTENSION OPTIONS

The term of this Lease shall commence on **June 1, 2011** (the "Commencement Date"), and continue on a month-to-month basis unless terminated by either party on thirty (30) days' notice to the other, or unless sooner terminated pursuant to the terms of this Lease ("Lease Term"). As long as Lessee is not in Default under this Lease and continues to maintain the Premises in good condition, meeting all of the operating covenants set forth herein and all of the requirements necessary to maintain its status as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, and to operate the Waterpark as an activity that is substantially related to its Section 501(c)(3) purposes, then this Lease shall automatically renew for an indefinite number of subsequent one (1) month terms.

## ARTICLE 4.    RENT

### Section 4.1    Base Rent

In consideration of and in reliance upon the Lessee's commitment to operate the Premises as an educational Waterpark and museum in a manner that is substantially related to both Lessee's and Lessor's Section 501(c)(3) purposes and as an integral part of the overall Development, the "Base Rent" for the initial Lease Term shall be Zero Dollars and No Cents ($0.00). Lessor may, at its sole option and discretion, elect to charge Base Rent upon thirty (30) days' notice to Lessee, which Base Rent shall be less than fair market rent for the Premises. All other amounts due and owing under this Lease, if any, shall be deemed "Additional Rent." Base Rent and Additional Rent are collectively referred to as "Rent." It is expressly agreed that the rent payable by Lessee has been established to reflect the savings below market rent resulting from exemption from taxation of the leased property.

### Section 4.2    Security Deposit

No security deposit shall be required to be paid by Lessee.

## ARTICLE 5.    LESSEE OBLIGATIONS

### Section 5.1    Repairs and Maintenance

Lessor shall not be required to make any repairs, alterations additions or improvements to or upon the Premises or the Property during the term of this Lease, except as specifically set forth hereinafter. Lessee hereby agrees to maintain and keep all of the Property areas, including all interior and exterior walls and doors; the systems, equipment and amenities constituting the Waterpark and museum; heating, ventilating and cooling systems; interior wiring; sprinkler systems, plumbing and drain pipes to sewers or septic tank, in good order and repair during the entire term of this Lease, at Lessee's own cost and expense, and to replace all fixtures, equipment, systems and other elements of the Premises ("Waterpark Systems") that may be broken or damaged during the term hereof (ordinary wear and tear excepted) with items of as good or better quality as that now in use. It is further agreed that Lessee will make no alterations, additions or improvements to or upon the Property without the written consent of Lessor first being obtained. Lessor agrees to make all necessary structural and capital repairs to the Building including Waterpark Systems, exterior walls, foundation, roof, gutters and downspouts, and the abutting sidewalks unless the structural integrity or Waterpark Systems is damaged due to Lessee's negligence, failure to perform its repair and maintenance responsibilities, misuse of the Premises (including overloading the floors or improperly stressing the roof supports), or willful misconduct. Lessor reserves and at any and all times shall have the right to alter, repair or improve the Property and the Building of which the Premises are a part, or to add thereto, and for that purpose at any time may erect scaffolding and all other necessary structures about and upon the Premises, and Lessor and Lessor's representatives, contractors and workers for that purpose may enter in or about the Premises with such materials as Lessor may deem necessary therefor, and Lessee waives any claim to damages, including loss of business resulting therefrom. Lessee shall be responsible to maintain the Premises in good condition and repair at all times and in compliance with all terms of this Lease. If any repair or maintenance work is performed by Lessor due to the negligence, neglect or misconduct of Lessee, Lessee shall promptly reimburse Lessor the cost of such work, plus interest thereon at the rate of eighteen percent (18%) from the date the expense was incurred by Lessor until reimbursed by Lessee. Lessee shall keep the Premises free and clear of rubbish, debris, and litter at all times. Lessee shall keep the sidewalks and parking lots on the Property free and clear of ice, snow, rubbish, debris and obstruction. Lessee will not permit, debris, ice or snow to accumulate on the roof of the Building so as to stop up or obstruct gutters or downspouts or cause damage to the roof, and will save harmless and protect Lessor against any injury whether to Lessor or to Lessor's property or to any other person or property caused by Lessee's failure in that regard.

### Section 5.2    Utilities

Lessee shall promptly pay any and all charges for gas, electricity, telephone, trash removal, internet and all other charges for utilities or services which may be furnished to the Building and its allocated share of such charges for the Common Areas. Lessor shall have no responsibility to provide any utility services to the Premises that are not already in place. Lessee also agrees to pay all parking lot maintenance and utility charges for the Property and allocated to the Premises relating to the Common Areas.

4 – **Waterpark Lease**

### Section 5.3   Taxes

The Property is currently tax exempt. Should all or any portion of the Property become taxable in the future, through no fault or action of Lessor, then Lessee agrees to pay all lawful real property taxes and assessments, including any special assessments, which during the Lease Term or any extension may become a lien or which may be levied by the State, County, City, or any other tax levying body upon the Property. Lessee shall pay any taxes relating to is own personal property or operations, if any, and any real property taxes that result if Lessee's use of all or a portion of the Premises does not qualify as tax exempt.

### Section 5.4   Operating Covenants

During the Lease Term, Lessee agrees that it shall operate and maintain a first-class educational waterpark and museum for the general public in a manner that is substantially related to and in furtherance of its Section 501(c)(3) purposes. To that end, Lessee shall establish and maintain regular operating hours to be open to the public; continuously maintain the Waterpark equipment, Waterpark Systems and the Waterpark features and exhibits (including, but not limited to the museum) in good and clean condition; sponsor educational community events to encourage visitors to come to the Waterpark; sponsor special events that highlight aviation history and water safety and education; host special events that promote and/or raise money for the Development; and do all things necessary to maintain a first-class educational waterpark and museum.

## ARTICLE 6.   LESSEE'S OTHER OBLIGATIONS

### Section 6.1   Construction of Improvements

Lessee shall undertake no construction, alteration, or changes on or to the Premises without the prior written consent of Lessor, which approval shall be conditioned upon submission of a reasonable construction plan, contracts, schedule and all necessary permits.

### Section 6.2   No Liens

Lessee agrees to pay, when due, all sums for labor, services, materials, supplies, utilities, furnishings, machinery or equipment which have been provided or ordered with Lessee's consent to the Premises. If any lien is filed against the Premises which Lessee wishes to protest, then Lessee shall immediately notify Lessor of the basis for its protest and must deposit cash with Lessor, or procure a bond acceptable to Lessor, in an amount sufficient to cover the cost of removing the lien from the Premises. Failure to remove the lien or furnish the cash or a bond acceptable to Lessor within ten (10) days shall constitute an Event of Default under this Lease and Lessor shall be entitled to satisfy the lien without further notice to Lessee, and Lessee shall immediately reimburse Lessor for any sums so paid to remove any such lien.

### Section 6.3   Access to Premises

Lessor and its respective agents shall have the right to enter upon the Premises for the purposes of: (a) confirming the performance by Lessee of all obligations under this Lease; (b) doing any other act which Lessor may be obligated or have the right to perform under this

5 – Waterpark Lease

Lease; and (c) for any other lawful purpose. Such entry shall be made on reasonable advance notice and during normal business hours, where practical, except in cases of emergency or a suspected violation of this Lease or the law. Lessee waives any claim against Lessor for damages for any injury or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Premises or any other loss occasioned by such entry except to the extent caused by the gross negligence or willful misconduct of Lessor. Lessee shall provide Lessor with keys with which to unlock all gates and doors in, upon or about the Premises, and Lessor shall have the right to use any and all means which Lessor may deem reasonable to open such gates and doors in an emergency in order to obtain entry into the Premises.

### Section 6.4    Safety Requirements

Lessee shall conduct its operations, activities and duties under this Lease in a safe manner, and in compliance with all safety standards imposed by applicable federal, state and local laws and regulations and those in connection with the first-class operation of an educational waterpark. Lessee shall require the observance of the foregoing by all employees, subcontractors and all other persons transacting business with or for Lessee in any way connected with the conduct of Lessee pursuant to this Lease. Lessee shall exercise due and reasonable care and caution to prevent and control fire on the Premises and to that end shall provide and maintain fire suppression and other fire protection equipment as may be required pursuant to applicable governmental laws, ordinances, statutes and codes for the purpose of protecting the improvements adequately and restricting the spread of any fire from the Premises to any property adjacent to the Premises, all at Lessee's sole cost and expense. Lessee shall be solely responsible for provision and maintenance of fire extinguishers, and for maintenance of the sprinkler systems.

## ARTICLE 7.    PARKING & SECURITY

### Section 7.1    Parking

Lessee shall have the nonexclusive use, in conjunction with Lessor and other tenants of the Development, of all parking areas in the Development.

### Section 7.2    Security

Lessee is solely responsible for any and all of its property located on the Premises or on the Property. Lessee expressly waives any claim against Lessor for any loss or damage to Lessee's property. Lessor shall not be responsible for the actions of any other parties who may come onto the Property or the Premises.

## ARTICLE 8.    INSURANCE REQUIREMENTS

### Section 8.1    Generally

Insurance requirements set forth below do not in any way limit the amount or scope of liability of Lessee under this Lease. The amounts listed indicate only the minimum amounts of insurance coverage that Lessor is willing to accept to help insure full performance of all terms

Case 16-30233-rld11    Doc 62-1    Filed 05/02/16

and conditions of this Lease. All insurance required by this Lease shall meet the following minimum requirements of this Article 8.

### Section 8.2    Certificates; Notice of Cancellation

On or before the Commencement Date, Lessee shall provide Lessor with certificates of insurance establishing the existence of all insurance policies required under this Lease. Thereafter, Lessor must receive notice of the expiration or renewal of any policy prior to the expiration or cancellation of any insurance policy. No insurance policy may be canceled, revised, terminated or allowed to lapse without at least thirty (30) days' prior written notice being given to Lessor. Insurance must be maintained without any lapse in coverage continuously for the duration of this Lease. Insurance canceled without Lessor's consent shall be deemed an immediate Event of Default under this Lease. Lessor shall also be given certified copies of Lessee's policies of insurance promptly upon request.

### Section 8.3    Additional Insured

Lessor shall be named as an additional insured in each required liability policy. Such insurance shall not be invalidated by any act, neglect or breach of contract by Lessee. Lessee shall provide Lessor with a policy endorsement evidencing that Lessor is a named additional insured.

### Section 8.4    Primary Coverage

The required policies shall provide that the coverage is primary, and will not seek any contribution from any insurance or self-insurance carried by Lessor.

### Section 8.5    Company Ratings

All policies of insurance must be written by companies having an A.M. Best rating of "A" or better, or equivalent. Lessor may, upon thirty (30) days' written notice to Lessee, require Lessee to change any carrier whose rating drops below an "A" rating.

### Section 8.6    Required Insurance

At all times during the Lease Term, Lessee shall provide and maintain the following types of coverage:

#### 8.6.1    General Liability Insurance

Lessee shall maintain a commercial general liability policy (including coverage for broad form contractual liability, aircraft liability coverage, and any personal injury liability) for the protection of Lessee, and insuring Lessee and Lessor against liability for damages because of personal injury, bodily injury, death, or damage to property, including loss of use thereof, and occurring on or in any way related to the Premises or occasioned by reason of the operations or actions of Lessee. All such coverage shall name Lessor as an additional insured. All such coverage shall be in an amount of not less than Five Million Dollars ($5,000,000)

combined single limit per occurrence for bodily injury and property damage for all coverage specified herein.

### 8.6.2    All Risk Physical Damage Coverage

Lessee shall maintain All Risk Physical Damage Coverage as required by Lessor on all assets of Lessor and Lessee. Lessee will also provide coverage for all other assets leased to Lessee. Deductibles are to be approved by Lessor. Such insurance shall provide for a full waiver of subrogation against Lessor all of its directors, officers, partners, employees, contractors and agents. Lessee shall maintain such other personal property insurance as required by Lessor and such insurance shall provide for a full waiver of subrogation against Lessor and all of its directors, officers, partners, employees, contractors and agents.

### 8.6.3    Automobile Liability Insurance

Lessee shall maintain an occurrence form automobile liability policy insuring Lessee and Lessor against liability for damage because of bodily injury, death, or damage to property, including loss of use thereof, and occurring or in any way related to the use, loading or unloading of Lessee's owned, hired and nonowned vehicles on and around the Premises. Such insurance shall name Lessor as an additional insured. Coverage shall be in an amount of not less than One Million Dollars ($1,000,000) combined single limit per occurrence.

### 8.6.4    Workers' Compensation Insurance

Lessee shall maintain, in force, Workers' Compensation insurance for all of Lessee's employees, including coverage for Employer's Liability.

### 8.6.5    Additional Coverage Requirements

Lessee shall also be required to carry additional coverage as appropriate to cover activities specific to the Permitted Use and liquor liability insurance in an amount of not less than Five Million Dollars ($5,000,000). Such coverage shall name Lessor as an additional insured.

### 8.6.6    Property Insurance

Lessee shall maintain a policy of Property Damage insurance insuring the Building and the personal property of Lessor as required by Lessor. All coverage levels will increase in accordance with inflation factors. Such insurance shall provide for a full waiver of subrogation against Lessee all of its directors, officers, partners, employees, contractors.

### Section 8.7    Damage or Destruction of Premises

If Lessor determines that the Premises or any interest therein is rendered untenable by casualty damage or destruction, then this Lease shall terminate as to such portion as may be untenable. If Lessor determines that the damage does not feasibly permit the continuation of the operation of the Premises by Lessee, this Lease shall terminate. Such termination shall be effective as of the date of such damage. Lessee shall not be entitled to any insurance proceeds

paid with respect to the Premises and other property owned by Lessor but shall be entitled to proceeds for damage to Lessee's own Personal Property (as defined in Section 10.2).

### Section 8.8    Waiver of Subrogation

Lessor and Lessee agree that each forfeits any right of action that it may later acquire against the other for loss or damage to its property, or to property in which it may have an interest, where such loss is caused by fire, or any of the extended coverage hazards, including sprinkler leakage, and arises out of or is connected with the Premises, to the extent that such loss or damage is covered by insurance. All such claims for any and all loss, however caused, hereby are waived. Such absence of liability shall exist whether or not the damage or destruction is caused by negligence of either Lessor or Lessee or by any of their respective agents, contractors, invitees, or employees. It is the intention and agreement of Lessor and Lessee that both parties shall fully provide their own insurance protection at their own expense, and that both parties shall look to their respective insurance carriers for reimbursement of any such loss, and further, that the insurance carriers involved shall not be entitled to subrogation under any circumstances against either party to this Lease. Neither Lessor nor Lessee shall have any interest or claim in the other's insurance policy or policies, or the proceeds thereof, unless specifically covered therein as an additional insured.

## ARTICLE 9.    DEFAULT

### Section 9.1    Events of Default

Any one of the following shall constitute an "Event of Default":

#### 9.1.1    Default in Rent

Failure of Lessee to pay any Rent or any other amount due hereunder within five (5) Business Days after written notice from Lessor; provided, however, that Lessor shall not be required to provide such notice more than two (2) times in any calendar year.

#### 9.1.2    Default in Other Covenants

Failure of Lessee to comply with any term or condition or fulfill any obligation of this Lease (other than the payment of Rent or other charges), including but not limited to Lessee's obligation to maintain its Section 501(c)(3) status and to operate the Waterpark in a manner that substantially furthers its Section 501(c)(3) purposes, within thirty (30) days after written notice by Lessor specifying the nature of the default with reasonable particularity. If the default is of such a nature that it cannot be completely remedied within the thirty (30) day period, this provision shall be complied with if Lessee begins correction of the default within such thirty (30) day period and thereafter proceeds with reasonable diligence and in good faith to effect the remedy as soon as practicable; provided, however, that should Lessee violate the same provision of this Lease more than twice during any one year period, then after the second time, the default shall be considered an immediate Event of Default for which no further notice or opportunity to cure need be given.

9 – Waterpark Lease

### 9.1.3   Failure to Operate

Lessee's failure to operate its Permitted Use on the Premises for a period of longer than sixty (60) days without the express permission of Lessor shall be considered abandonment and an immediate Event of Default hereunder.

### 9.1.4   Insolvency

An assignment by Lessee for the benefit of creditors; filing by Lessee of voluntary petition in bankruptcy; and adjudication that Lessee is bankrupt or the appointment of receiver of the properties of Lessee; the filing of an involuntary petition of bankruptcy and failure of Lessee to secure a dismissal of the petition within thirty (30) days after filing; attachment of or the levying of execution on the leasehold interest and failure of Lessee to secure discharge of the attachment or release of the levy of execution within thirty (30) days.

### Section 9.2   Remedies an Default

If an Event of Default shall occur, Lessor, at its sole option, may terminate this Lease by notice, in writing, by certified mail or personal service to Lessee.  The notice may be given pursuant to Section 14.9 before or within any of the above-referenced cure periods or grace periods for default and may be included in a notice of failure of compliance.  If the Premises is abandoned by Lessee in connection with a default, termination may be automatic and without notice, at Lessor's sole option.

### 9.2.1   Termination and Damages

If this Lease is terminated, Lessor shall be entitled to recover promptly, without waiting until the due date, any future Rent that would otherwise become due and owing up to and through the date fixed for expiration of the Lease term, any damages suffered by Lessor, including without limitation, all obligations of Lessee, and the reasonable costs of reentry and reletting the Premises including without limitation the cost of any clean up, refurbishing, removal of Personal Property including fixtures, or any other expense occasioned by Lessee's failure to quit the Premises upon termination and to leave them in the condition required at the expiration of this Lease, attorney fees, court costs, broker commissions and advertising costs. Lessor shall have no obligation to mitigate damages, except as required by Oregon law at the time of termination.  Whether or not this Lease is terminated, Lessor shall be entitled to collect any damages it may incur, and if not terminated, including any ongoing Rent as it becomes due.

### 9.2.2   Reentry After Termination

If the Lease is terminated for any reason, Lessee's liability for damages shall survive such termination, and the rights and obligations of the parties shall be as follows:

(a)   Lessee shall vacate the Premises immediately, remove any Personal Property of Lessee including any fixtures which Lessee is required to remove at the end of the Lease Term, perform any cleanup, alterations or other work required to leave the Premises in the condition required at the end of the Lease Term, and deliver all keys to Lessor.

10 – Waterpark Lease

(b)     Lessor may reenter, take possession of the Premises and remove any persons or Personal Property by legal action or by self-help with the use of reasonable force and without liability for damages. Any Personal Property that is not removed within thirty (30) days of an uncured Event of Default shall be deemed abandoned and Lessor may dispose of it in any manner Lessor sees fit without any liability to Lessee.

### 9.2.3   Right to Sue More than Once

Lessor may sue periodically to recover damages and no action for damages shall bar a later action for damages subsequently accruing.

### 9.2.4   Equitable Relief

Lessor may seek injunctive relief or an order of specific performance from any court of competent jurisdiction requiring that Lessee perform its obligations under this Lease.

### Section 9.3     No Waiver of Default

No failure by Lessor to insist on the strict performance of any agreement, term, covenant, or condition of this Lease or to exercise any right or remedy consequent upon a breach, and no acceptance of partial Rent during the continuance of any such breach, shall constitute a waiver of any such breach or of such agreement, term, covenant, or condition. No agreement, term, covenant, or condition to be performed or complied with by Lessee, and no breach by Lessee, shall be waived, altered, or modified except by a written instrument executed by Lessor. No waiver of any breach shall affect or alter this Lease, but each and every agreement, term, covenant, and condition of this Lease shall continue in full force and effect with respect to any other then-existing or subsequent breach.

### Section 9.4     Remedies Cumulative and Nonexclusive

Each right and remedy in this Lease will be cumulative and will be in addition to every other right or remedy in this Lease, or existing at law or in equity, including, without limitation, suits for injunctive relief and specific performance. The exercise or beginning of the exercise by Lessor of any such rights or remedies will not preclude the simultaneous or later exercise by Lessor of any other such rights or remedies. All such rights and remedies are nonexclusive.

### Section 9.5     Curing Lessee's Default

If Lessee fails to perform any of Lessee's obligations under this Lease, Lessor, without waiving such failure, may (but shall not be obligated to) perform the same for the account of and at the expense of Lessee (using Lessor's own funds, when required), after the expiration of thirty (30) days from the date Lessor gives Lessee notice of the failure, or sooner in the case of an emergency. Lessor shall not be liable to Lessee for any claim for damages resulting from such action by Lessor. Lessee agrees to reimburse Lessor, upon demand, for any amounts Lessor spends in curing Lessee's default. Any sums to be so reimbursed shall bear interest at the rate of eighteen percent (18%) per annum.

### Section 9.6      Administrative Costs

If Lessor gives Lessee one (1) written notice of a violation of a specific provision of this Lease and Lessee violates the same provision again during the subsequent twelve (12) month period, then, in addition to all other rights and remedies set forth herein, Lessee agrees to reimburse Lessor for its reasonable administrative costs incurred in connection with any such subsequent violation. Failure by Lessee to pay such costs shall be deemed an Event of Default.

## ARTICLE 10.    TERMINATION

Upon termination of the Lease, Lessee shall deliver all keys to Lessor and surrender the Premises broom clean and in good condition, ordinary wear and tear excepted. Alterations constructed by Lessee with permission from Lessor are not to be removed or restored to the original condition unless required by Lessor, as provided in Section 10.1. All repairs for which Lessee is responsible shall be completed prior to such surrender.

### Section 10.1     Title to Lessee Improvements upon Termination

All improvements, excluding Personal Property, located on the Premises at the expiration or earlier termination of this Lease, shall, at Lessor's option, become the sole property of Lessor. Notwithstanding the foregoing, Lessor reserves the right, in its sole discretion, to require Lessee to remove some or all of the improvements placed on the Premises by Lessee from the Premises upon termination of this Lease.

### Section 10.2     Lessee's Personal Property

Lessee's museum pieces, Waterpark equipment, removable decorations, detached floor coverings, signs, blinds, furnishings, trade fixtures and other personal property placed upon the Premises by Lessee ("Personal Property") shall remain the property of Lessee. At or before the termination of this Lease, Lessee, at Lessee's expense, shall remove from the Premises any and all of Lessee's Personal Property and shall repair any damage to the Premises resulting from the installation or removal of such Personal Property. Any items of Personal Property that remain on the Premises after the termination date of this Lease may either be: (a) retained by Lessor without any requirement to account to Lessee therefor; or (b) removed and disposed of by Lessor, without any requirement to account to Lessee therefor, with Lessor being entitled to recover all costs thereof from Lessee.

### Section 10.3     Time for Removal

The time for removal of any Personal Property or improvements made by Lessee which Lessee is required to remove from the Premises upon termination shall be as follows: (a) by the Expiration Date; or (b) if this Lease is terminated prior to the Expiration Date, then all removal must occur within thirty (30) days following the actual termination date and Lessee must continue to pay all Rent due until such time as all Personal Property and the improvements required to be removed have been properly and completely removed.

12 – Waterpark Lease

### Section 10.4   Holdover

If Lessee fails to vacate the Premises at the time required, such holdover shall not be deemed to operate as a renewal or extension of this Lease but shall only create a tenancy at sufferance which may be terminated at will and at any time by Lessor.

### Section 10.5   For Rent and For Sale

During a period of time that is one hundred twenty (120) days prior to the date fixed for termination of this Lease, Lessor may post on the Premises signs notifying the public that the Premises is for lease.  At any time during the Lease Term, Lessor may place signs on the Property and/or Common Areas notifying the public that the Property is for sale.

## ARTICLE 11.   ENVIRONMENTAL OBLIGATIONS OF LESSEE

### Section 11.1   Definitions

As used in this Lease, the following terms shall be defined as follows:

#### 11.1.1   Environmental Laws

"Environmental Laws" shall be interpreted in the broadest sense to include any and all federal, state and local statutes, regulations, rules and ordinances now or hereafter in effect, as the same may be amended from time to time, which in any way govern materials, substances or products and/or relate to the protection of health, safety or the environment.

#### 11.1.2   Hazardous Substances

"Hazardous Substances" shall be interpreted in the broadest sense to include any substance, material or product defined or designated as hazardous, toxic, radioactive, dangerous or regulated wastes or substances or any other similar term in or under any Environmental Laws.

#### 11.1.3   Environmental Costs

"Environmental Costs" shall be interpreted in the broadest sense to include, but shall not necessarily be limited to: (i) costs or expenses relating to any actual or claimed violation of or noncompliance with any Environmental Law; (ii) all claims of third parties, including governmental agencies, for damages, response costs or other relief; (iii) the cost, expense or loss to Lessor as a result of any injunctive relief, including preliminary or temporary injunctive relief, applicable to Lessor or the Premises; (iv) all expenses of evaluation, testing, analysis, clean-up, remediation, removal and disposal relating to Hazardous Substances, including fees of attorneys, engineers, consultants, paralegals and experts; (v) all expenses of reporting the existence of Hazardous Substances or the violation of Environmental Laws to any agency of the State of Oregon or the United States as required by applicable Environmental Laws; (vi) any and all expenses or obligations, including, without limitation, attorneys' and paralegal fees, incurred at, before and after any trial or appeal therefrom or any administrative proceeding or appeal therefrom whether or not taxable as costs, including, without limitation, attorneys' and paralegal fees, witness fees (expert and otherwise), deposition costs, copying,

Case 16-30233-rld11    Doc 62-1    Filed 05/02/16

telephone and telefax charges and other expenses; and (vii) any damages, costs, fines, liabilities and expenses which are claimed to be owed by any federal, state or local regulating or administrative agency.

### Section 11.2    Limited Business Use of Hazardous Substances

Lessee may, in the normal course of Lessee's business and to the extent necessary for Lessee's Permitted Use of the Premises, use certain Hazardous Substances on the Premises in compliance with all of the following conditions: (a) use of such Hazardous Substances is in compliance with all Environmental Laws; (b) use of such Hazardous Substances does not expose the Premises or neighboring properties to any meaningful risk of contamination or damage; and (c) other than ordinary office and janitorial supplies, water treatment chemicals and substances fully contained inside of automobiles located on the Premises. Lessee shall be permitted to use only those Hazardous Substances and in such quantities as are required to carry on Lessee's Permitted Use of the Premises. Lessor may condition its consent to the use or presence of any Hazardous Substance on the Premises upon Lessee's giving Lessor such additional assurances as Lessor, in its discretion, deems necessary to protect itself, the public, the Premises and the environment against damage, contamination, injury or liability therefrom, including, but not limited to, the installation (and removal on or before termination of this Lease) of reasonable protective modifications to the Premises, the posting of a security deposit, or an increase in insurance coverage. Lessor reserves the right to inventory or cause to be inventoried any such Hazardous Substances being used and to approve or deny use of the same. Ordinary janitorial supplies which are available over the counter for use by the general public may be used on the Premises without written permission from Lessor so long as they are used in small quantities for normal cleanup activities and in accordance with all laws and the provisions of this Lease. In no event shall Lessee store, handle, transport, dispose, or treat any Hazardous Substances on the Premises which are generated by or from cleanup, removal, or remediation operations or activities from third party sources outside the Premises. No fuel tank storage is allowed on the Premises, except for emergency generator fueling tanks.

### Section 11.3    Environmental Inspection

Lessor reserves the right to inspect for Hazardous Substances and/or Lessee's management of Hazardous Substances on the Premises at any time, and from time to time, without notice to Lessee. If Lessor at any time during the Lease Term or any extension thereof has reason to believe that Lessee is handling Hazardous Substances contrary to the requirements of this Lease, in violation of this Lease or in any manner that may allow contamination of the Premises, Lessor may, without limiting its other rights and remedies, cause to be conducted an environmental audit with respect to the matters of concern to Lessor. Lessor shall be given an original copy of the audit results. Lessee shall cooperate with all such requests.

### Section 11.4    Environmental Safety

Pursuant to the terms of this Lease, Lessee must comply with all applicable state, federal and local laws and ordinances. As a part of this requirement, Lessee shall maintain Material Safety Data Sheets for each and every Hazardous Substance used by Lessee, Lessee's agents, employees, contractors, licensees or invitees on the Premises, as required under the Hazard

14 – Waterpark Lease

Communication Standard in 29 C.F.R. §1910.1200, as it may be amended, redesignated or retitled from time to time, and comparable state and local statutes and regulations. In order to ensure that such information is available to Lessor in the event of a spill or other emergency, all such information shall be kept current at all times and a copy of all such materials shall be kept in a place known to and easily accessible to Lessor.

### Section 11.5    Disposal of Hazardous Substances

Lessee shall not dispose of any Hazardous Substance, regardless of the quantity or concentration, within the storm and/or sanitary sewer drains and plumbing facilities within the Premises, or other property of Lessor. The disposal of Hazardous Substances shall be in approved containers and removed from the Premises only in accordance with all Environmental Laws. If Lessee knows, or has reasonable cause to believe, that any release of a Hazardous Substance has come to be located on or beneath the Premises, Lessee must immediately give written notice of that condition to Lessor.

### Section 11.6    Notice to Lessor

Lessee shall immediately notify Lessor upon becoming aware of a violation or alleged violation of any Environmental Law and/or: (a) any leak, spill, release or disposal of a Hazardous Substance on, under or adjacent to the Premises or threat of or reasonable suspicion of any of the same; and/or (b) any notice or communication to or from a governmental agency or any other person directed to Lessee or any other person relating to such Hazardous Substance on, under or adjacent to the Premises or any violation or alleged violation of, or noncompliance or alleged noncompliance with, any Environmental Laws with respect to the Premises.

### Section 11.7    Certification

Not later than thirty (30) days after receipt of written request from Lessor, Lessee shall provide a written certification to Lessor, signed by Lessee, which certifies that Lessee has not received any notice from any governmental agency regarding a violation of or noncompliance with any Environmental Law; or, if such notice was received, Lessee shall explain the reason for the notice, what has been done to remedy the problem and shall attach a copy of the notice. Lessee shall also certify that Lessee has obtained and has in force all permits required under Environmental Laws. Copies of all such permits shall be made available to Lessor, upon request.

### Section 11.8    Documentation of Hazardous Substances

Lessee shall maintain for periodic inspection by Lessor and deliver to Lessor, at Lessor's request, true and correct copies of the following documents (hereinafter referred to as the "Documents") related to the handling, storage, disposal and emission of Hazardous Substances, concurrently with the receipt from or submission to a governmental agency: Permits; approvals; reports and correspondence; storage and management plans; spill prevention control and countermeasure plans; other spill contingency and emergency response plans; documents relating to taxes for Hazardous Substances; notice of violations of any Environmental Laws; plans relating to the installation of any storage tanks to be installed in, under or around the Premises (provided said installation of tanks shall only be permitted after Lessor has given Lessee its written consent to do so, which consent may be withheld in Lessor's sole discretion); and all

15 – Waterpark Lease

closure plans or any other documents required by any and all federal, state and local governmental agencies and authorities for any storage tanks or other facilities installed in, on or under the Premises.

## ARTICLE 12.  INDEMNITIES

### Section 12.1    General Indemnity

Lessee agrees to defend (using legal counsel acceptable to Lessor), indemnify, and hold harmless Lessor from and against any and all actual or alleged claims, damages, expenses, costs, fees (including, but not limited to, attorney, accountant, paralegal, expert, and escrow fees), fines, and/or penalties (collectively "Costs") which may be imposed upon or claimed against Lessor or and which, in whole or in part, directly or indirectly, arise from or are in any way connected with: (a) any act, omission or negligence of Lessee or Lessee's respective partners, officers, directors, agents, employees, invitees or contractors; (b) any use, operation, occupation, management or control of the Premises by Lessee, whether or not due to Lessee's own act or omission and whether or not occurring on the Premises; (c) any condition created in or about the Premises by Lessee, including any accident, injury or damage occurring on or about the Premises after the Commencement Date; (d) any breach, violation or nonperformance of any of Lessee's obligations under this Lease; or (e) any damage caused by Lessee on or to the Premises.  For purposes of the indemnity provisions of this Lease, "Lessee" shall be deemed to include Lessee and Lessee's respective partners, officers, directors, members, managers, agents, employees, invitees and/or contractors.

### Section 12.2    Environmental Indemnity

Without in any way limiting the generality of Section 12.1, Lessee shall be solely responsible for and agrees to defend (using legal counsel acceptable to Lessor), indemnify and hold harmless Lessor from and against all Environmental Costs claimed against or assessed against Lessor arising, in whole or in part, directly or indirectly, from acts or omissions of Lessee and Lessee's respective partners, officers, directors, members, managers, agents, employees, invitees and/or contractors on or about the Premises after the Commencement Date of this Lease or earlier if caused by Lessee or Lessee's respective partners, officers, directors, members, managers, agents, employees, invitees and/or contractors.  This indemnification shall require Lessee to reimburse Lessor for any diminution in value of the Premises, the Property or other adjacent or nearby property, caused by Hazardous Substances, including damages for the loss or restriction on use of rentable or usable space or of any amenity of the Premises, the Property, the Development or any other Lessor property, including damages arising from any adverse impact on marketing of space in or near the Premises, including the Property.  Lessee's obligations shall not apply if the Hazardous Substances were deposited on the Premises by Lessor or its agents. Lessee shall be solely responsible to assure that Lessee and its agents or invitees do not bring Hazardous Substances onto the Premises, except as allowed by this Lease.  Notwithstanding the foregoing, Lessee shall not be responsible for, and does not indemnify Lessor for, any actions of Lessor that cause environmental damage or a violation of any Environmental Law on the Premises.

16 – Waterpark Lease

### Section 12.3   Survival

This Article 12 shall survive the termination of this Lease with respect to all matters arising prior to surrender of the Premises by Lessee.

### Section 12.4   Scope of Indemnity

For purpose of this Article 12, references to "Lessor" shall be deemed to include its respective officers, directors, employees, agents, and contractors, all of whom are fully indemnified as provided above.

## ARTICLE 13.   ASSIGNMENT AND SUBLETTING

Lessee shall not in any manner, directly or indirectly, by operation of law or otherwise, lease, assign, sublease, transfer or encumber any of Lessee's rights in and to this Lease or any interest therein, nor license or permit the use of the rights herein granted in whole or in part without the prior written consent of Lessor, which consent may be withheld in Lessor's sole discretion. Lessee shall not assign all or any part of its rights and interests under this Lease to any successor to its business through merger, consolidation, or voluntary sale or transfer of substantially all of its assets, without prior written approval of Lessor, which consent may be withheld in Lessor's sole discretion.  This Lease may only be assigned with the express written consent of Lessor, which consent may be granted or denied in Lessor's sole discretion.

## ARTICLE 14.   GENERAL PROVISIONS

### Section 14.1   Covenants, Conditions, and Restrictions

This Lease is subject and subordinate to the effect of any covenants, conditions, restrictions, easements, mortgages, deeds of trust, ground leases, rights of way, and any other matters of record now or hereafter imposed upon the Premises and to any applicable land use or zoning laws or regulations. Lessee shall, upon request of Lessor, execute and deliver agreements of subordination in the form requested by Lessor.

### Section 14.2   Condemnation

If the Premises or any interest therein is taken as a result of the exercise of the right of eminent domain, this Lease shall terminate as to such portion as may be taken. If either Lessee or Lessor determines that the portion of the Premises taken does not feasibly permit the continuation of the operation of the Waterpark by Lessee, then this Lease shall terminate. Such termination shall be effective as of the date of taking. Lessee shall not be entitled to, and hereby expressly waives any right to, any part of any condemnation award or the proceeds of any such condemnation.

### Section 14.3   Nonwaiver

Waiver by either party of strict performance of any provision of this Lease shall not be a waiver of or prejudice such party's right to require strict performance of the same provision in the future or of any other provision.

17 – Waterpark Lease

### Section 14.4    Attorney Fees

If a suit, action, or other proceeding of any nature whatsoever (including any proceeding under the U.S. Bankruptcy Code), is instituted in connection with any controversy arising out of this Lease or to interpret or enforce any rights or obligations hereunder, the prevailing party shall be entitled to recover attorney, paralegal, accountant, and other expert fees and all other fees, costs, and expenses actually incurred and reasonably necessary in connection therewith, as determined by the court or body at trial or on any appeal or review, in addition to all other amounts provided by law. Payment of all such fees shall also apply to any administrative proceeding, trial, and/or any appeal or petition for review. Whenever this Lease requires one party to defend the other party, it is agreed that such defense shall be by legal counsel acceptable to the party to be defended, understanding that claims are often covered by insurance with the insurance carrier designating the defense counsel.

### Section 14.5    Time of Essence

It is mutually agreed that time is of the essence in the performance of all covenants and conditions to be kept and performed under the terms of this Lease.

### Section 14.6    Warranties/Guarantees

Lessor makes no warranty, guarantee, or averment of any nature whatsoever concerning the physical condition of the Premises, the Property or the Development, or suitability of the Premises for Lessee's use. It is agreed that Lessor will not be responsible for any loss, damage or costs which may be incurred by Lessee by reason of any such condition.

### Section 14.7    Headings

The Article and Section headings contained herein are for convenience in reference and are not intended to define or limit the scope of any provisions of this Lease.

### Section 14.8    Consent of Lessor

Whenever consent, approval or direction by Lessor is required under the terms contained herein, all such consent, approval or direction shall be received in writing from Lessor.

### Section 14.9    Notices

All notices required under this Lease shall be deemed to be properly served when actually received or the third Business Day after mailing, if sent by certified mail, return receipt requested, to the last address previously furnished by the parties hereto in accordance with the requirements of this Section. Until hereafter changed by the parties by notice in writing, sent in accordance with this Section, notices shall be sent to the following addresses:

If to Lessor:

The Michael King Smith Foundation
3850 Three Mile Lane
McMinnville, Oregon 97128

If to Lessee:

The Captain Michael King Smith Evergreen Aviation Educational Institute
500 NE Captain Michael King Smith Way
McMinnville, Oregon 97128

Any notice given in accordance with the provisions of this Section 14.9 shall be effective upon receipt (or refusal of receipt) at the address of the addressee, if delivered by personal delivery; any notice delivered by certified mail shall be deemed received by the addressee on the date signed for or on the date the receipt is returned as refused or unclaimed; or by express mail delivery left at the notice address, as evidenced by courier receipt. The addresses to which notices are to be delivered may be changed by giving notice of such change in address in accordance with this notice provision.

### Section 14.10 Governing Law

This Lease shall be governed and construed according to the laws of the State of Oregon, without regard to its choice of law provisions. Any action or suit to enforce or construe any provision of this Lease by either party shall be brought in the Circuit Court of the State of Oregon for Multnomah County, or U.S. District Court located in Multnomah County, Oregon. The Circuit Court of the State of Oregon for Multnomah County or the U.S. District Court located in Multnomah County shall have exclusive jurisdiction over all lawsuits brought by either party against the other with respect to the subject matter of this Lease, and each party hereby irrevocably consents to such exclusive jurisdiction and waives any and all objections it might otherwise have with respect thereto.

### Section 14.11 Nonwaiver

Waiver by either party to the strict performance of any provision of this Lease shall not be deemed a waiver of or prejudice of that party's right to require strict performance of the same provision in the future or of any other provision.

### Section 14.12 Survival

Any covenant or condition (including, but not limited to, environmental and land use obligations and indemnification agreements) set forth in this Lease, the full performance of which is not specifically required prior to the expiration or earlier termination of this Lease, and any covenant or condition which by its terms is to survive, shall survive the expiration or earlier termination of this Lease and shall remain fully enforceable thereafter.

19 – Waterpark Lease

### Section 14.13 Partial Invalidity

If any provision of this Lease shall be held to be unenforceable or invalid, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all of the other provisions of this Lease shall be deemed valid and enforceable to the fullest extent of the law.

### Section 14.14 Modification

This Lease may not be modified except by a writing signed by both parties hereto.

### Section 14.15 Successors

The rights, liabilities and remedies provided in this Lease shall extend to the heirs, legal representatives, successors and, so far as the terms of this Lease permit, successors and assigns of the parties. The words "Lessor," "Lessee," and their accompanying verbs or pronouns, wherever used in the Lease, shall apply equally to all persons, firms, or corporations which may be or become such parties to this Lease.

### Section 14.16 Limitation on Liability

Lessor's liability under this Lease shall be limited to whatever interest it holds in the Premises, subject to and subordinate to any rights of the lenders or creditors of Lessor.

### Section 14.17 No Light or View Easement

The reduction or elimination of Lessee's light or view will not affect Lessee's obligations under this Lease, nor will it create any liability of Lessor to Lessee.

### Section 14.18 Calculation of Time

Unless referred to as Business Days, all periods of time referred to in this Lease shall include Saturdays, Sundays, and Legal holidays. However, if the last day of any period falls on a Saturday, Sunday, or Legal holiday, then the period shall be extended to include the next day which is not a Saturday, Sunday or Legal holiday. "Legal holiday" shall mean any holiday observed by the federal government. "Business Days" shall mean Monday through Friday, excluding Legal holidays.

### Section 14.19 Exhibits Incorporated by Reference

All Exhibits attached to this Lease are incorporated by reference in this Lease for all purposes.

### Section 14.20 Brokers

Lessee and Lessor each represent to one another that they have not dealt with any leasing agent or broker in connection with this Lease and each agrees to indemnify and hold harmless the other from and against all damages, costs, and expenses (including attorney, accountant and

paralegal fees) arising in connection with any claim of an agent or broker alleging to have been retained by the other in connection with this Lease.

### Section 14.21 Successors; the Parties

The rights, liabilities and remedies provided for in this Lease shall extend to the heirs, legal representatives, and, so far as the terms of this Lease permit, successors and assigns of the parties hereto. The words "Lessor" and "Lessee" and their accompanying verbs or pronouns, wherever used in this Lease, shall apply equally to all persons, firms, or corporations which may be or become such parties hereto.

### Section 14.22 Interpretation of Lease; Status of Parties

This Lease is the result of arms-length negotiations between Lessor and Lessee and shall not be construed against Lessor by reason of its preparation of this Lease document. Nothing contained in this Lease, including the method of computation of rentals or construction of Lessee improvements, shall be deemed or construed as creating the relationship of principal and agent, partners, joint venturers, or any other similar relationship, between the parties hereto.

### Section 14.23 No Recordation of Lease

This Lease shall not be recorded except at Lessor's request.

### Section 14.24 Force Majeure

The time for performance of any of Lessee's or Lessor's obligations hereunder (other than payment obligations) shall be extended for a period equal to any hindrance, delays or suspension in the performance of such party's obligations, beyond such party's reasonable control and directly impacting such party's ability to perform, caused by any of the following events: Unusually severe acts of nature, including floods, earthquakes, hurricanes and other extraordinary weather conditions; civil riots, war, terrorism, or invasion; major fire or other major unforeseen casualty; labor strike that precludes the party's performance of the work in progress; extraordinary and unanticipated shortages of materials, or significant changes in the law (each a "Force Majeure Event"). Lack of funds or willful or negligent acts of a party shall not constitute a Force Majeure Event hereunder. Further, it shall be a condition to any extension of the time for a party's performance hereunder that such party notify the other party within five (5) Business Days following the occurrence of the Force Majeure Event and diligently pursue the delayed performance as soon as is reasonably possible.

### Section 14.25 Capacity to Execute; Mutual Representations

Lessor and Lessee each warrant and represent to one another that this Lease constitutes a legal, valid and binding obligation of that party. Without limiting the generality of the foregoing, each party represents that its governing body has authorized the execution, delivery and performance of this Lease by it. The individuals executing this Lease warrant that they have full authority to execute this Lease on behalf of the entity for whom they purport to be acting.

*[Signatures on following page]*

21 – Waterpark Lease

**IN WITNESS WHEREOF,** the parties hereto have subscribed their names.

Lessor:

**THE MICHAEL KING SMITH FOUNDATION**

By: _DELFORD M. Smith_

Name: _DELFORD M. Smith_

As Its: _Trustee_

Lessee:

**EVERGREEN AVIATION AND SPACE MUSEUM AND THE CAPTAIN MICHAEL KING SMITH EDUCATIONAL INSTITUTE**

By: _____

Name: _JOHN P IRWIN_

As Its: _TREASURER_

[Signature Page to Lease]

**EXHIBIT A**

<u>Legal Description of the Property</u>

A – 1

The Property
(New Legal Description – Parcel 2)
Tax Lot 600

January 17, 2012
NWS Project No. 686
Tax Lot 600 Adjusted
Page 1 of 2

A tract of land in the south one-half of Section 23, Township 4 South, Range 4 West of the Willamette Meridian in Yamhill County, Oregon, more particularly described as follows:

Commencing at a point on the south line of the Reuben Harris Donation Land Claim No. 80, said point being a brass disk located at the northwest corner of the John White Donation Land Claim No. 82; thence along the south line of said Harris Donation Land Claim North 89°57'08" East a distance of 141.08 feet to the southeast corner of the 344/1000 of a chain (22.70 feet) wide parcel of land described in Parcel 2 of that property conveyed to Evergreen Agricultural Enterprises, Inc. by deed recorded May 15, 2003 as Document No. 2003-11230, Deed Records of Yamhill County, Oregon; thence along the easterly line of said 344/1000 of a chain wide parcel, North 00°28'14" East a distance of 956.50 feet to a 5/8 inch iron rod located at the northeast corner thereof, said point being also on the southerly line of the 23.00 foot wide parcel of land described in Parcel 2 of said Document No. 2003-11230; thence along the southerly line of said 23.00 foot wide parcel North 89°55'14" East a distance of 0.15 feet to the most southerly southeast corner thereof; thence along the easterly boundary of said 23.00 foot wide parcel North 00°28'14" East a distance of 23.00 feet to a 5/8 inch iron rod and the Point of Beginning.

Thence South 89°55'14" West a distance of 426.37 feet to a 5/8 inch iron rod; thence North 00°21'50" East a distance of 928.32 feet to a 5/8 inch iron rod on the north line of that tract described in Contract of Sale between Elsie M. Maynard, et vir, as vendors, and Albert A. Albertini, et ux, as vendees, recorded May 5, 1965 in Film Volume 45, Page 136, Deed and Mortgage Records of Yamhill County, said north line being also the recognized division line of said Harris Donation Land Claim; thence along the north line of said property described in Film Volume 45, Page 136, South 89°03'00" East a distance of 3467.05 feet to the northeast corner of that property described in Memorandum Agreement recorded March 5, 1976 in Film Volume 111, Page 091, Deed and Mortgage Records of Yamhill County; thence along the easterly line of said property described in Film Volume 111, Page 091, and the southerly extension thereof, South 00°27'50" West a distance of 1817.22 feet to a point on the northerly right-of-way line of Three Mile Lane; thence along said northerly right-of-way line South 89°57'08" West a distance of 1596.64 feet to a 5/8 inch iron rod located at the most southerly southeast corner of that property identified as the "Museum Tract" in Schedule 2 of Lot Adjustment Deed recorded November 27, 2002 as Document No. 2002-23658, Deed Records of Yamhill County, Oregon; thence along the easterly boundary of said "Museum Tract", North 00°20'28" East a distance of 909.73 feet to an angle point thereon; thence continuing along said easterly boundary, North 89°58'18" East a distance of 370.00 feet to an angle point thereon; thence continuing along said easterly boundary, North 00°20'28" East a distance of 491.48 feet to a 5/8 inch iron rod; thence departing said easterly boundary, South 89°50'51" West a distance of 1145.00 feet to a 5/8 inch iron rod on the most westerly line of said "Museum Tract"; thence along said most westerly line, South 00°22'58" West a distance of 132.01 feet to a 5/8 inch iron rod; thence departing said most westerly line, South 89°54'25" West a distance of 430.74

050826-0085/PDXDOCS:1958195.2

feet to a 5/8 inch iron rod; thence South 00°05'35" East a distance of 317.02 feet to a 5/8 inch iron rod; thence South 89°55'14" West a distance of 236.99 feet to the Point of Beginning.
*Tax Lot 600 Adjusted*
*Page 2 of 2*

EXCEPTING THEREFROM that tract conveyed to H. & R. Burch Limited Partnership in Film Volume 299, Page 1369, Deed and Mortgage Records of Yamhill County.

ALSO EXCEPTING THEREFROM that portion conveyed to the City of McMinnville, a Municipal Corporation by Dedication of Easement and Right of Way recorded in Instrument No. 2003-04463, Deed Records of Yamhill County

Said described tract of land contains 87.26 acres, more or less.

The basis of bearings is Yamhill County Survey No. 12,766.

REGISTERED
PROFESSIONAL
LAND SURVEYOR

*[signature: Scott F. Field]*

OREGON
JUNE 22, 19??
SCOTT F. FIELD
2844

Renewal 12/31/2013

**EXHIBIT B**

Depiction of the Development



# EXTENSION OF LEASE TERM ON WATERPARK LEASE FOR THE YEAR 2016

## RECITALS

A. Reference is hereby made to that certain Lease between **THE MICHAEL KING SMITH FOUNDATION** ("Lessor") and **EVERGREEN AVIATION AND SPACE MUSEUM AND THE CAPTAIN MICHAEL KING SMITH EDUCATIONAL INSTITUTE** ("Lessee"), dated as of June 1, 2011, as amended by that certain First Amendment to Lease, effective as of August 23, 2012 and as amended by that certain Second Amendment to Lease, effective as of June 30, 2013 (collectively, the "Lease") with respect to the Premises identified therein. A copy of the Lease is attached hereto as Exhibit A and incorporated herein by this reference.

B. Lessor and Lessee are collectively referred to as the "Parties."

C. Pursuant to the Article 3 of the Lease, the Lease Term expires on December 31, 2015, unless there is an extension to the Lease.

D. The Parties entered into lease extensions of the Lease Term and now desire to extend the Lease Term for a one year period from January 1, 2016 through December 31, 2016.

E. The Parties recognized that this Lease extension does not address all rights and obligations under the Bankruptcy Order issued in *In Re Evergreen Vintage Aircraft, Inc.,* Case No. 14-36770-rld11 and the Parties' reserve all rights and claims assigned to each under the Vintage Bankruptcy Order ("Vintage Bankruptcy Order"), and all other rights and claims held under applicable non-bankruptcy law.

Therefore, for good and valuable consideration, which is stated herein and which the Parties agree is sufficient to make this Extension a valid and binding contract, the Parties agree to the following terms:

## TERMS

1. The Lease, attached hereto as Exhibit A, shall be extended on the same terms and conditions as stated in Exhibit A from January 1, 2016 at 12:01 a.m. PST through December 31, 2016, at 11:59 pm PST.

2. The Effective Date of this Extension is January 1, 2016 regardless of the date(s) on which this Extension is signed.

3. The Parties agree that the sole effect of this Extension is to memorialize the Parties' agreement to extend the Lease Term for a one-year period, beginning January 1, 2016. The Parties reserve all of their respective rights, claims, arguments, and defenses in law and in equity, in whole and in part, relating to the Vintage Bankruptcy Order and/or applicable law. This Extension does not and shall not in any way be interpreted to waive, release, or otherwise alter either and/or each party's rights, obligations, claims and defenses, in whole or in part, pursuant to the Vintage Bankruptcy Order, the existing Lease and any extension thereto, or applicable law.

4. The Parties agree that the Recitals are true and are incorporated herein as terms of this Extension.

5. This Extension may be executed in any number of counterparts, and all such counterparts shall together constitute the same agreement. Delivery of an executed counterpart of a signature page of this agreement by facsimile transmission or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Extension.

## ACKNOWLEDGMENT

The Parties acknowledge they have read this Extension and the attached Exhibit A, fully understand and voluntarily agree to the terms therein, and represent that signers listed below are authorized to bind the Party identified above their respective signatures. The Parties acknowledge that they have had ample opportunity to consult with an attorney before entering into this Extension.

**ACCEPTED BY:**

**LESSEE EVERGREEN AVIATION AND SPACE MUSEUM and the CAPTAIN MICHAEL KING SMITH EDUCATIONAL INSTITUTE**

Dated this 24th day of March, 2016, *nunc pro tunc* effective January 1, 2016.

By: Ann Witsil, Interim Executive Director
500 NE Michael King Smith Way
McMinnville, Oregon 97128
503-434-4185
ann.witsil@evergreenmuseum.org

**ACCEPTED BY:**

**LESSOR – MICHAEL KING SMITH FOUNDATION**

Dated this _27th_ day of March, 2016, *nunc pro tunc*, effective January 1, 2016.

By:  Lisa Anderson, MKS Foundation Trustee
lisa.anderson@greenpatchfarms.com

## SECOND AMENDMENT TO LEASE

This Second Amendment to Lease (this "Amendment") is entered into and made effective as of June 30, 2013 ("Effective Date") by and between **The Michael King Smith Foundation** ("Lessor") and **Evergreen Aviation and Space Museum and The Captain Michael King Smith Educational Institute** ("Lessee"). This Amendment amends that certain Lease of June 1, 2011 between Lessor and Lessee for the lease of Property defined therein (the "Lease"). Unless otherwise defined herein, capitalized terms used in this Amendment have the meanings given to them in the Lease.

## AMENDMENT

1.    **ARTICLE 3.** Article 3 of the Lease is hereby deleted and replaced with the following:

**ARTICLE 3. TERM AND RENEWAL**

The term of this Lease shall commence on **June 1, 2011** (the "Commencement Date"), and continue for an initial term of two (2) years, unless sooner terminated pursuant to the terms of this Lease ("Lease Term"). This Lease term is extended through December 31, 2014. As long as Lessee is not in Default under this Lease and continues to maintain the Premises in good condition, meeting all of the operating covenants set forth herein and all of the requirements necessary to maintain its status as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, and to operate the Waterpark as an activity that is substantially related to its Section 501(c)(3) purposes, then this Lease shall automatically renew for a term of one calendar year beginning January 1, 2015, unless Lessor or Lessee issues a Notice of Nonrenewal delivered to the other party before December 1, 2014.

The foregoing Amendment is entered into as of the following date: _Sept. 25, 2014_ with an effective date nunc pro tunc of June 30, 2013.

Lessor:

**THE MICHAEL KING SMITH FOUNDATION**

By: _Delford Smith_
Name: _Delford M. Smith_
As Its: _Trustee_

Lessee:

**EVERGREEN AVIATION AND SPACE MUSEUM AND THE CAPTAIN MICHAEL KING SMITH EDUCATIONAL INSTITUTE**

By: _Larry Wood_
Name: _LARRY A. WOOD_
As Its: _EXECUTIVE DIRECTOR_

1

**EXHIBIT C-2**

**EXISTING SPACE MUSEUM LEASE**

{00289001.DOC; 2}

# LEASE

### Between

## THE MICHAEL KING SMITH FOUNDATION

### and

## THE CAPTAIN MICHAEL KING SMITH EVERGREEN AVIATION EDUCATIONAL INSTITUTE

**Effective Date: JUNE 1, 2008**

# TABLE OF CONTENTS

Page

ARTICLE 1.     AGREEMENT TO LEASE..................................................5

ARTICLE 2.     PREMISES .....................................................................5

    Section 2.1    Description.................................................................5
    Section 2.2    Permitted Use and Compliance with all Laws.............5
    Section 2.3    Limits on Use...........................................................5
    Section 2.4    Permitted Accessory Uses .........................................6
    Section 2.5    Condition of Property/No Warranties..........................6
    Section 2.6    Signage....................................................................6
    Section 2.7    Overloading of Floors................................................6

ARTICLE 3.     TERM ..........................................................................6

    Section 3.1    Term and Extension Options ......................................6

ARTICLE 4.     RENT ...........................................................................7

    Section 4.1    Base Rent .................................................................7
    Section 4.2    Security Deposit .......................................................7

ARTICLE 5.     LESSEE OBLIGATIONS ..............................................7

    Section 5.1    Repairs and Maintenance...........................................7
    Section 5.2    Utilities ...................................................................8
    Section 5.3    Taxes.......................................................................8
    Section 5.4    Operating Covenants .................................................8

ARTICLE 6.     LESSEE'S OTHER OBLIGATIONS ..............................8

    Section 6.1    Construction of Improvements ...................................8
    Section 6.2    No Liens...................................................................8
    Section 6.3    Access to Premises ...................................................8
    Section 6.4    Safety Requirements .................................................9

ARTICLE 7.     PARKING & SECURITY..............................................9

    Section 7.1    Parking....................................................................9
    Section 7.2    Security ...................................................................9

ARTICLE 8.     INSURANCE REQUIREMENTS...................................9

    Section 8.1    Generally.................................................................9
    Section 8.2    Certificates; Notice of Cancellation............................9
    Section 8.3    Additional Insured ..................................................10
    Section 8.4    Primary Coverage ...................................................10
    Section 8.5    Company Ratings.....................................................10
    Section 8.6    Required Insurance ..................................................10
        8.6.1        General Liability Insurance ................................10
        8.6.2        All Risk Physical Damage Coverage...................10

**i - Space Museum Lease**

|          | 8.6.3       | Automobile Liability Insurance ........................................10 |
|          | 8.6.4       | Workers' Compensation Insurance ..................................11 |
|          | 8.6.5       | Additional Coverage Requirements ................................11 |
|          | 8.6.6       | Property Insurance ...........................................................11 |
| Section 8.7 | | Damage or Destruction of Premises ..................................11 |
| Section 8.8 | | Waiver of Subrogation ........................................................11 |

ARTICLE 9.     DEFAULT ...............................................................................12

| Section 9.1 | | Events of Default ...............................................................12 |
|          | 9.1.1       | Default in Rent.................................................................12 |
|          | 9.1.2       | Default in Other Covenants ............................................12 |
|          | 9.1.3       | Failure to Operate ...........................................................12 |
|          | 9.1.4       | Insolvency........................................................................12 |
| Section 9.2 | | Remedies on Default..........................................................12 |
|          | 9.2.1       | Termination and Damages ..............................................12 |
|          | 9.2.2       | Reentry After Termination .............................................13 |
|          | 9.2.3       | Right to Sue More than Once .........................................13 |
|          | 9.2.4       | Equitable Relief ..............................................................13 |
| Section 9.3 | | No Waiver of Default ........................................................13 |
| Section 9.4 | | Remedies Cumulative and Nonexclusive .........................13 |
| Section 9.5 | | Curing Lessee's Default ...................................................14 |
| Section 9.6 | | Administrative Costs .........................................................14 |

ARTICLE 10.     TERMINATION .......................................................................14

| Section 10.1 | | Title to Lessee Improvements upon Termination...............14 |
| Section 10.2 | | Lessee's Personal Property ...............................................14 |
| Section 10.3 | | Time for Removal ..............................................................15 |
| Section 10.4 | | Holdover ............................................................................15 |
| Section 10.5 | | For Rent and For Sale ......................................................15 |

ARTICLE 11.     ENVIRONMENTAL OBLIGATIONS OF LESSEE ...........15

| Section 11.1 | | Definitions ........................................................................15 |
|          | 11.1.1      | "Environmental Laws" ....................................................15 |
|          | 11.1.2      | "Hazardous Substances" .................................................15 |
|          | 11.1.3      | "Environmental Costs" ....................................................15 |
| Section 11.2 | | Limited Business Use of Hazardous Substances ...........16 |
| Section 11.3 | | Environmental Inspection .................................................16 |
| Section 11.4 | | Environmental Safety ........................................................16 |
| Section 11.5 | | Disposal of Hazardous Substances ...................................17 |
| Section 11.6 | | Notice to Lessor ................................................................17 |
| Section 11.7 | | Certification ......................................................................17 |
| Section 11.8 | | Documentation of Hazardous Substances ........................17 |

ARTICLE 12.     INDEMNITIES.........................................................................18

| Section 12.1 | | General Indemnity .............................................................18 |
| Section 12.2 | | Environmental Indemnity ..................................................18 |
| Section 12.3 | | Survival..............................................................................18 |

**ii - Space Museum Lease**

Section 12.4          Scope of Indemnity ...................................................18

ARTICLE 13.          ASSIGNMENT AND SUBLETTING ..........................................19

ARTICLE 14.          GENERAL PROVISIONS ................................................19

Section 14.1          Covenants, Conditions, and Restrictions ..........................19
Section 14.2          Condemnation.......................................................19
Section 14.3          Nonwaiver..........................................................19
Section 14.4          Attorney Fees.....................................................19
Section 14.5          Time of Essence...................................................20
Section 14.6          Warranties/Guarantees.............................................20
Section 14.7          Headings..........................................................20
Section 14.8          Consent of Lessor ................................................20
Section 14.9          Notices...........................................................20
Section 14.10         Governing Law ....................................................21
Section 14.11         Nonwaiver.........................................................21
Section 14.12         Survival..........................................................21
Section 14.13         Partial Invalidity...............................................21
Section 14.14         Modification......................................................21
Section 14.15         Successors........................................................21
Section 14.16         Limitation on Liability...........................................21
Section 14.17         No Light or View Easement ........................................21
Section 14.18         Calculation of Time ..............................................22
Section 14.19         Exhibits Incorporated by Reference ...............................22
Section 14.20         Brokers...........................................................22
Section 14.21         Successors; the Parties ..........................................22
Section 14.22         Interpretation of Lease; Status of Parties........................22
Section 14.23         No Recordation of Lease ..........................................22
Section 14.24         Force Majeure ....................................................22
Section 14.25         Capacity to Execute; Mutual Representations ......................23

**iii - Space Museum Lease**

# DEFINITIONS

ADA ...................................................................................................................... 6
Additional Rent ..................................................................................................... 7
Base Rent .............................................................................................................. 7
Building ................................................................................................................. 5
Business Days ...................................................................................................... 23
Commencement Date ............................................................................................ 6
Costs ................................................................................................................... 19
Documents ........................................................................................................... 18
Environmental Costs ............................................................................................. 16
Environmental Laws ............................................................................................. 16
Force Majeure Event ............................................................................................. 23
Hazardous Substances .......................................................................................... 16
Lease ..................................................................................................................... 5
Lease Term ............................................................................................................ 6
Legal holiday ........................................................................................................ 23
Lessee .................................................................................................................... 5
Lessor .................................................................................................................... 5
OLCC ..................................................................................................................... 6
Personal Property ................................................................................................. 15
Premises ................................................................................................................. 5
Property ................................................................................................................. 5
Rent ....................................................................................................................... 7

4 - Space Museum Lease

LEASE

THIS LEASE ("Lease") is effective as of the 1st day of June, 2008, by and between **The Michael King Smith Foundation** ("Lessor") and **The Captain Michael King Smith Evergreen Aviation Educational Institute**, a nonprofit Oregon corporation ("Lessee").

## ARTICLE 1. AGREEMENT TO LEASE

Lessor owns certain real estate, located in the City of McMinnville, County of Yamhill and State of Oregon, including land and improvements, commonly known as the Evergreen Aviation and Space Museum and the Captain Michael King Smith Educational Institute, legally described on **Exhibit A**, attached hereto and incorporated by reference herein (the "Property"). Lessor hereby agrees to lease to Lessee and Lessee hereby agrees to lease from Lessor, a portion of the Property as follows:

## ARTICLE 2. PREMISES

### Section 2.1       Description

Lessor hereby leases to Lessee, on the terms and conditions stated below, a building consisting of approximately one hundred and thirty thousand square feet (130,000 sq. ft.) (the "Building"), together with all improvements located therein, or to be made thereto by either Lessor or Lessee (collectively the "Premises"). Included for use in conjunction with the Premises is a non exclusive right of use of parking in the parking area.

### Section 2.2       Permitted Use and Compliance with all Laws

Lessee shall use the Premises only for the following purpose(s): Operation of an aviation education institute and space museum ("Museum") and accessory related uses to include a gift store and restaurant facilities as described herein ("Permitted Use"). No other use may be made of the Premises without the prior written approval of Lessor. At all times during this Lease, Lessee shall comply with all applicable laws, ordinances, rules and regulations of the state, federal, or local governments and all other government authorities with jurisdiction over the Premises. Lessee shall promptly provide to Lessor copies of all communications to or from any such government entity which relate to Lessee's noncompliance, or alleged noncompliance, with any laws or other government requirements impacting the Premises.

### Section 2.3       Limits on Use

Lessee shall not use, nor permit anyone else to use the Premises, or permit anything to be done in the Premises, which (a) adversely affects, or is likely to adversely affect, the Premises, the Property or any element or part of the Premises or the Property, or the operations of the Premises or the Property; (b) creates any condition that may be a safety hazard; (c) creates a condition that may increase the rate of fire insurance for the Premises or the Property or would prevent Lessor from taking advantage of any ruling of an insurance rating bureau that would allow Lessor to obtain reduced rates for its insurance policies, or violates any requirements of Lessee's insurance carrier; or (d) creates a hazard or a nuisance. Unless approved by Lessor, Lessee will not store gasoline or any other combustible materials on the Premises.

**5 – Space Museum Lease**

### Section 2.4     Permitted Accessory Uses

Lessor agrees that Lessee shall be allowed to enter into rental/use agreements for all or a portion of the Premises on a short term temporary basis to third parties for special events. All food and beverage services for such events must be provided by a caterer who Lessee has verified is licensed to serve food to the public and all food is prepared and served in accordance with all legal requirements. Alcohol may only be brought onto and served on the Premises for any such event provided that a current license to serve alcohol is in place and is properly posted, as required by law, and service is made in accordance with all Oregon Liquor Commission Control ("OLCC") regulations. No service of alcohol to minors shall be allowed. Lessee shall be solely liable and responsible for the actions of any third party sublessees, caterers, contractors and other contractors, including their respective employees, guests, agents and contractors.

### Section 2.5     Condition of Property/No Warranties

Except as set forth in this Lease, Lessor makes no warranties or representations regarding the condition of the Premises or the Property, including, without limitation, the suitability of Premises for intended uses or the condition of the improvements. Lessee has inspected and accepts the Premises in "AS IS" condition upon taking possession. Lessor shall have no liability to Lessee, and Lessee shall have no claim against Lessor, for any damage or injury or loss of use caused by the condition of the Premises or the Property. Lessor shall have no responsibility to bring the Premises into compliance with any laws, including, without limitation, any building or occupancy codes, permit conditions, or certification requirements. Lessee shall be solely responsible for thoroughly inspecting the Premises and ensuring that it is in compliance with all laws. Lessee shall be solely responsible for ensuring that the Premises meets all requirements of the Americans With Disabilities Act ("ADA") and that all permitting and zoning requirements needed for Lessee's Permitted Use are in place and in full force and effect.

### Section 2.6     Signage

All signage must be pre-approved, in writing, by Lessor.

### Section 2.7     Overloading of Floors

Lessee will not overload the floors of the Premises in such a way as to cause any undue or serious stress or strain upon the Building and Lessor shall have the right, at any time, to call upon any competent engineer or architect whom Lessor may choose, to decide whether or not the floors of the Premises, or any part thereof, are being overloaded so as to cause any undue or serious stress or strain on the Building, or any part thereof, and the decision of the engineer or architect shall be final and binding upon Lessee; and in the event that it is the opinion of the engineer or architect that the stress or strain is such as to endanger or injure the Building Lessee agrees immediately to relieve the stress or strain, either by reinforcing the Building or by lightening the load which causes such stress or strain, in a manner satisfactory to Lessor.

## ARTICLE 3. TERM

### Section 3.1     Term and Extension Options

The term of this Lease shall commence on June 1, 2008 (the "Commencement Date"), and continue for a lease term of five years (5) years, expiring on June 1, 2013, unless sooner terminated pursuant to the terms of this Lease ("Lease Term"). As long as Lessee is not in Default under this Lease and continues to maintain the Premises in good condition, meeting all of the operating covenants set forth herein and all of the requirement necessary to maintain its 501(c)(3) status, then this Lease shall automatically renew for an indefinite number of

6 – Space Museum Lease

subsequent five (5) year Lease Terms until such time as either Lessor or Lessee elects not to have this Lease automatically renew and so notifies the other party at least ninety (90) days prior to the expiration of the then current Lease Term that the Lease shall terminate upon the last day of that Lease Term. Rent and updated lease terms will be reasonably negotiated by the parties at any time prior to the expiration of any given Lease Term for any subsequent five (5) year Lease Term.

## ARTICLE 4. RENT

### Section 4.1    Base Rent

The "Base Rent" for the Lease Term shall be zero dollars and no cents ($0). All other amounts due and owing under this Lease, if any, shall be deemed "Additional Rent." Base Rent and Additional Rent are collectively referred to as "Rent."

### Section 4.2    Security Deposit

No Security Deposit shall be required to be paid by Lessee.

## ARTICLE 5. LESSEE OBLIGATIONS

### Section 5.1    Repairs and Maintenance

Lessor shall not be required to make any repairs, alterations additions or improvements to or upon the Premises or the Property during the term of this Lease, except as specifically set forth hereinafter. Lessee hereby agrees to maintain and keep all of the Property areas, including all interior and exterior walls and doors, heating, ventilating and cooling systems, interior wiring, sprinkler systems, plumbing and drain pipes to sewers or septic tank, in good order and repair during the entire term of this Lease, at Lessee's own cost and expense, and to replace all glass which may be broken or damaged during the term hereof in the windows and doors of the premises with glass of as good or better quality as that now in use; it is further agreed that the Lessee will make no alterations, additions or improvements to or upon the Property without the written consent of Lessor first being obtained. Lessor agrees to make all necessary structural repairs to the Building including exterior walls, foundation, roof, gutters and downspouts and the abutting sidewalks unless the structural integrity is damaged due to Lessee's negligence, failure to perform its repair and maintenance responsibilities, misuse of the Premises (including overloading the floors or improperly stressing the roof supports), or willful misconduct. Lessor reserves and at any and all times shall have the right to alter, repair or improve the Property and the Building of which the Premises are a part, or to add thereto, and for that purpose at any time may erect scaffolding and all other necessary structures about and upon the Premises and Lessor and Lessor's representatives, contractors and workers for that purpose may enter in or about the Premises with such materials as Lessor may deem necessary therefor, and Lessee waives any claim to damages, including loss of business resulting therefrom. Lessee shall be responsible to maintain the Premises in good condition and repair at all times and in compliance with all terms of this Lease. If any repair or maintenance work is performed by Lessor due to the negligence, neglect or misconduct of Lessee, Lessee shall promptly reimburse Lessor the cost of such work, plus interest thereon at the rate of eighteen percent (18%) from the date the expense was incurred by Lessor until reimbursed by Lessee. Lessee shall keep the Premises free and clear of rubbish, debris, and litter at all times. Lessee shall keep the sidewalks and parking lots on the Property free and clear of ice, snow, rubbish, debris and obstruction. Lessee will not permit, debris, ice or snow to accumulate on the roof of the building so as to stop up or obstruct gutters or downspouts or cause damage to the roof, and will save harmless and protect Lessor against any injury whether to Lessor or to Lessor's property or to any other person on property caused by Lessee's failure in that regard.

7 – Space Museum Lease

### Section 5.2  Utilities

Lessee shall promptly pay any and all charges for, gas, electricity, telephone, garbage, internet and all other charges for utilities or services which may be furnished to the Building and parking areas. Lessor shall have no responsibility to provide any utility services to the Premises that are not already in place. Lessee also agrees to pay all parking lot maintenance and utility charges.

### Section 5.3  Taxes

The Property is currently tax exempt. Should all or any portion of the Property become taxable in the future, through no fault or action of Lessee, then Lessee agrees to pay all lawful real property taxes and assessments, including any special assessments, which during the term hereof or any extension may become a lien or which may be levied by the State, County, City, or any other tax levying body upon the Property. Lessee shall pay any taxes relating to is own personal property or operations, if any and any real property taxes that result if Lessee's use of all or a portion of the Premises does not qualify as tax exempt.

### Section 5.4  Operating Covenants

During the term of this Lease, Lessee agrees that it shall maintain a first-class Museum. To that end, Lessee shall establish and maintain regular operating hours to be open to the public; continuously maintain the exhibits and the Museum in good and clean condition; sponsor educational community events to encourage visitors to come to the Museum; sponsor special events that highlight aviation and space history; host special events that promote and/or raise money for the Museum; and do all things necessary to maintain a first-class aviation and space Museum.

## ARTICLE 6. LESSEE'S OTHER OBLIGATIONS

### Section 6.1  Construction of Improvements

Lessee shall undertake no construction, alteration, or changes, on or to the Premises, without the prior written consent of Lessor, which approval shall be conditioned upon submission of a reasonable construction plan and schedule.

### Section 6.2  No Liens

Lessee agrees to pay, when due, all sums for labor, services, materials, supplies, utilities, furnishings, machinery or equipment which have been provided or ordered with Lessee's consent to the Premises. If any lien is filed against the Premises which Lessee wishes to protest, then Lessee shall immediately notify Lessor of the basis for its protest and must deposit cash with Lessor, or procure a bond acceptable to Lessor, in an amount sufficient to cover the cost of removing the lien from the Premises. Failure to remove the lien or furnish the cash or a bond acceptable to Lessor within ten (10) days shall constitute an Event of Default under this Lease and Lessor shall be entitled to satisfy the lien without further notice to Lessee and Lessee shall immediately reimburse Lessor for any sums so paid to remove any such lien.

### Section 6.3  Access to Premises

Lessor and its respective agents shall have the right to enter upon the Premises for the purposes of: (1) confirming the performance by Lessee of all obligations under this Lease; (2) doing any other act which Lessor may be obligated or have the right to perform under this Lease; and (3) for any other lawful purpose. Such entry shall be made on reasonable advance notice and

Case 16-30233-rld11    Doc 62-1    Filed 05/02/16

during normal business hours, where practical, except in cases of emergency or a suspected violation of this Lease or the law. Lessee waives any claim against Lessor for damages for any injury or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Premises or any other loss occasioned by such entry except to the extent caused by the gross negligence or willful misconduct of Lessor. Lessee shall provide Lessor with keys with which to unlock all gates and doors in, upon or about the Premises, and Lessor shall have the right to use any and all means which Lessor may deem reasonable to open such gates and doors in an emergency in order to obtain entry into the Premises.

### Section 6.4     Safety Requirements

Lessee shall conduct its operations, activities and duties under this Lease in a safe manner, and in compliance with all safety standards imposed by applicable federal, state and local laws and regulations. Lessee shall require the observance of the foregoing by all subcontractors and all other persons transacting business with or for the Lessee in any way connected with the conduct of Lessee pursuant to this Lease. Lessee shall exercise due and reasonable care and caution to prevent and control fire on the Premises and to that end shall provide and maintain fire suppression and other fire protection equipment as may be required pursuant to applicable governmental laws, ordinances, statutes and codes for the purpose of protecting the improvements adequately and restricting the spread of any fire from the Premises to any property adjacent to the Premises, all at Lessee's sole cost and expense. Lessees shall be solely responsible for provision and maintenance of fire extinguishers, and for maintenance of the sprinkler systems.

## ARTICLE 7. PARKING & SECURITY

### Section 7.1     Parking

Lessee shall have the nonexclusive use, in conjunction with Lessor, of all parking areas on the Property.

### Section 7.2     Security

Lessee is solely responsible for any and all of its property located on the Premises or on the Property. Lessee expressly waives any claim against Lessor for any loss or damage to Lessee's property. Lessor shall not be responsible for the actions of any other parties who may come onto the Property or the Premises.

## ARTICLE 8. INSURANCE REQUIREMENTS

### Section 8.1     Generally

Insurance requirements set forth below do not in any way limit the amount or scope of liability of Lessee under this Lease. The amounts listed indicate only the minimum amounts of insurance coverage that Lessor is willing to accept to help insure full performance of all terms and conditions of this Lease. All insurance required by this Lease shall meet the following minimum requirements of this Article 8.

### Section 8.2     Certificates; Notice of Cancellation

On or before the Commencement Date, Lessee shall provide Lessor with certificates of insurance establishing the existence of all insurance policies required under this Lease. Thereafter, Lessor must receive notice of the expiration or renewal of any policy prior to the expiration or cancellation of any insurance policy. No insurance policy may be canceled,

9 – Space Museum Lease

revised, terminated or allowed to lapse without at least thirty (30) days prior written notice being given to Lessor. Insurance must be maintained without any lapse in coverage continuously for the duration of this Lease. Insurance canceled without Lessor consent shall be deemed an immediate Event of Default under this Lease. Lessor shall also be given certified copies of Lessee's policies of insurance promptly upon request.

### Section 8.3     Additional Insured

Lessor shall be named as an additional insured in each required liability policy. Such insurance shall not be invalidated by any act, neglect or breach of contract by Lessee. Lessee shall provide Lessor with a policy endorsement evidencing that Lessor is a named additional insured.

### Section 8.4     Primary Coverage

The required policies shall provide that the coverage is primary, and will not seek any contribution from any insurance or self-insurance carried by Lessor.

### Section 8.5     Company Ratings

All policies of insurance must be written by companies having an A.M. Best rating of "A" or better, or equivalent. Lessor may, upon thirty (30) days written notice to Lessee, require Lessee to change any carrier whose rating drops below an "A" rating.

### Section 8.6     Required Insurance

At all times during this Lease, Lessee shall provide and maintain the following types of coverage:

#### 8.6.1   General Liability Insurance

Lessee shall maintain a commercial general liability policy (including coverage for broad form contractual liability, aircraft liability coverage, and any personal injury liability) for the protection of Lessee, and insuring Lessee and Lessor against liability for damages because of personal injury, bodily injury, death, or damage to property, including loss of use thereof, and occurring on or in any way related to the Premises or occasioned by reason of the operations or actions of Lessee. All such coverage shall name Lessor as an additional insured. All such coverages shall be in an amount of not less than **FIVE MILLION DOLLARS ($5,000,000.00)** combined single limit per occurrence for bodily injury and property damage for all coverage specified herein.

#### 8.6.2   All Risk Physical Damage Coverage

Lessee shall maintain All Risk Physical Damage Coverage as required by Lessor on all assets of Lessors. Lessee will also provide coverage for all other assets leased to Lessee. Deductibles are to be approved by Lessor. Such insurance shall provide for a full waiver of subrogation against Lessor all of its directors, officers, partners, employees, contractors and agents. Lessee shall maintain such other personal property insurance as it deems appropriate and such insurance shall provide for a full waiver of subrogation against Lessor all of its directors, officers, partners, employees, contractors and agents.

#### 8.6.3   Automobile Liability Insurance

Lessee shall maintain an occurrence form automobile liability policy insuring Lessee, and Lessor against liability for damage because of bodily injury, death, or damage to property, including loss of use thereof, and occurring or in any way related to the use, loading or unloading of Lessee's owned, hired and non-owned vehicles on and around the Premises. Such insurance shall name Lessor as an additional insured. Coverage shall be in an amount of not less than **ONE MILLION DOLLARS ($1,000,000.00)** combined single limit per occurrence.

### 8.6.4 Workers' Compensation Insurance

Lessee shall maintain, in force, Workers' Compensation insurance for all of Lessee's employees, including coverage for Employer's Liability.

### 8.6.5 Additional Coverage Requirements

Lessee shall also be required to carry additional coverage as appropriate to cover activities specific to the Permitted Uses, including hangar keeper's liability, all risk aircraft physical damage (hull coverage) and liquor liability insurance in an amount of not less than **FIVE MILLION DOLLARS ($5,000,000).** Such coverage shall name Lessor as an additional insured.

### 8.6.6 Property Insurance

Lessee shall maintain a policy of Property Damage insurance insuring the Building and the personal property of Lessor. All coverage levels will increase in accordance with inflation factors. Such insurance shall provide for a full waiver of subrogation against Lessee all of its directors, officers, partners, employees, contractors.

### Section 8.7 Damage or Destruction of Premises

If Lessor determines that the Premises or any interest therein is rendered untenable by casualty damage or destruction, this Lease shall terminate as to such portion as may be untenable. If Lessor determines that the damage does not feasibly permit the continuation of the operation of the facility by the Lessee, this Lease shall terminate. Such termination shall be effective as of the date of such damage. Lessee shall not be entitled to any insurance proceeds paid with respect to the Premises but shall be entitled to proceeds for damage to Lessee's own personal property and aircraft.

### Section 8.8 Waiver of Subrogation

Lessor and Lessee agree that each forfeits any right of action that it may later acquire against the other of the parties to the Lease for loss or damage to its property, or to property in which it may have an interest, where such loss is caused by fire, or any of the extended coverage hazards, including sprinkler leakage, and arises out of or is connected with the Premises, to the extent that such loss or damage is covered by insurance. All such claims for any and all loss, however caused, hereby are waived. Such absence of liability shall exist whether or not the damage or destruction is caused by negligence of either Lessor or Lessee or by any of their respective agents, contractors, invitees, or employees. It is the intention and agreement of Lessor and Lessee that both parties shall fully provide their own insurance protection at their own expense, and that both parties shall look to their respective insurance carriers for reimbursement of any such loss, and further, that the insurance carriers involved shall not be entitled to subrogation under any circumstances against any party to this Lease. Neither Lessor nor Lessee shall have any interest or claim in the other's insurance policy or policies, or the proceeds thereof, unless specifically covered therein as an additional insured.

# ARTICLE 9. DEFAULT

### Section 9.1      Events of Default

Any one of the following shall constitute an Event of Default:

#### 9.1.1   Default in Rent

Failure of Lessee to pay any Rent or other charge within five (5) Business Days after written notice from Lessor; provided, however, that Lessor shall not be required to provide such notice more than two (2) times in any calendar year.

#### 9.1.2   Default in Other Covenants

Failure of Lessee to comply with any term or condition or fulfill any obligation of the Lease (other than the payment of Rent or other charges) within thirty (30) days after written notice by Lessor specifying the nature of the default with reasonable particularity. If the default is of such a nature that it cannot be completely remedied within the thirty (30) day period, this provision shall be complied with if Lessee begins correction of the default within thirty (30) day period and thereafter proceeds with reasonable diligence and in good faith to effect the remedy as soon as practicable. Provided, however, that should Lessee violate the same provision of this Lease more than twice during any one year period, then after the second time, the default shall be considered an immediate Event of Default for which no further notice nor opportunity to cure need be given.

#### 9.1.3   Failure to Operate

Lessee's failure to operate its Permitted Use on the Premises for a period of longer than sixty (60) days without the express permission of Lessor shall be considered abandonment and an immediate Event of Default hereunder.

#### 9.1.4   Insolvency

An assignment by Lessee for the benefit of creditors; filing by Lessee of voluntary petition in bankruptcy; and adjudication that Lessee is bankrupt or the appointment of receiver of the properties of Lessee; the filing of an involuntary petition of bankruptcy and failure of the Lessee to secure a dismissal of the petition within thirty (30) days after filing; attachment of or the levying of execution on the leasehold interest and failure of the Lessee to secure discharge of the attachment or release of the levy of execution within thirty (30) days.

### Section 9.2      Remedies on Default

If an Event of Default shall occur, Lessor, at its sole option, may terminate this Lease by notice, in writing, by certified mail or personal service to Lessee. The notice may be given pursuant to **Section 14.9** before or within any of the above-referenced cure periods or grace periods for default and may be included in a notice of failure of compliance. If the Premises is abandoned by Lessee in connection with a default, termination may be automatic and without notice, at Lessor's sole option.

#### 9.2.1   Termination and Damages

If this Lease is terminated, Lessor shall be entitled to recover promptly, without waiting until the due date, any future Rent that would otherwise become due and owing up to and through the date fixed for expiration of the Lease term, any damages suffered by Lessor,

Case 16-30233-rld11    Doc 62-1    Filed 05/02/16

including without limitation, all obligations of Lessee, and the reasonable costs of reentry and reletting the Premises including without limitation the cost of any clean up, refurbishing, removal of Lessee's Personal Property including fixtures, or any other expense occasioned by Lessee's failure to quit the Premises upon termination and to leave them in the condition required at the expiration of this Lease, attorney fees, court costs, broker commissions and advertising costs. Lessor shall have no obligation to mitigate damages, except as required by Oregon law at the time of termination. Whether or not this Lease is terminated, Lessor shall be entitled to collect any damages it may incur, and if not terminated, including any ongoing Rent as it becomes due.

### 9.2.2    Reentry After Termination

If the Lease is terminated for any reason, Lessee's liability for damages shall survive such termination, and the rights and obligations of the parties shall be as follows:

(a)    Lessee shall vacate the Premises immediately, remove any Personal Property of Lessee including any fixtures which Lessee is required to remove at the end of the Lease term, perform any cleanup, alterations or other work required to leave the Premises in the condition required at the end of the term, and deliver all keys to Lessor.

(b)    Lessor may reenter, take possession of the Premises and remove any persons or Personal Property by legal action or by self-help with the use of reasonable force and without liability for damages. Any personal property, including aircraft that is not removed within thirty (30) days of an uncured Event of Default shall be deemed abandoned and Lessor may dispose of it in any manner Lessor sees fit without any liability to Lessee.

### 9.2.3    Right to Sue More than Once

Lessor may sue periodically to recover damages and no action for damages shall bar a later action for damages subsequently accruing.

### 9.2.4    Equitable Relief

Lessor may seek injunctive relief or an order of specific performance from any court of competent jurisdiction requiring that Lessee perform its obligations under this Lease.

### Section 9.3    No Waiver of Default

No failure by Lessor to insist on the strict performance of any agreement, term, covenant, or condition of this Lease or to exercise any right or remedy consequent upon a breach, and no acceptance of partial Rent during the continuance of any such breach, shall constitute a waiver of any such breach or of such agreement, term, covenant, or condition. No agreement, term, covenant, or condition to be performed or complied with by Lessee, and no breach by Lessee, shall be waived, altered, or modified except by a written instrument executed by Lessor. No waiver of any breach shall affect or alter this Lease, but each and every agreement, term, covenant, and condition of this Lease shall continue in full force and effect with respect to any other then-existing or subsequent breach.

### Section 9.4    Remedies Cumulative and Nonexclusive

Each right and remedy in this Lease will be cumulative and will be in addition to every other right or remedy in this Lease, or existing at law or in equity, including, without limitation, suits for injunctive relief and specific performance. The exercise or beginning of the exercise by

13 – Space Museum Lease

Lessor of any such rights or remedies will not preclude the simultaneous or later exercise by Lessor of any other such rights or remedies. All such rights and remedies are nonexclusive.

### Section 9.5     Curing Lessee's Default

If Lessee fails to perform any of Lessee's obligations under this Lease, Lessor, without waiving such failure, may (but shall not be obligated to) perform the same for the account of and at the expense of Lessee (using Lessor's own funds, when required), after the expiration of thirty (30) days from the date Lessor gives Lessee notice of the failure, or sooner, in the case of an emergency. Lessor shall not be liable to Lessee for any claim for damages resulting from such action by Lessor. Lessee agrees to reimburse Lessor, upon demand, for any amounts Lessor spends in curing Lessee's Default. Any sums to be so reimbursed shall bear interest at the rate of eighteen percent (18%).

### Section 9.6     Administrative Costs

If Lessor gives Lessee one (1) written notice of a violation of a specific provision of this Lease and Lessee violates the same provision again during the subsequent twelve (12) month period, then in addition to all other rights and remedies set forth herein, Lessee agrees to reimburse Lessor for its reasonable administrative costs incurred in connection with any such subsequent violation. Failure by Lessee to pay such costs shall be deemed an Event of Default.

## ARTICLE 10.     TERMINATION

Upon termination of the Lease, Lessee shall deliver all keys to Lessor and surrender the Premises broom clean and in good condition, ordinary wear and tear excepted. Alterations constructed by the Lessee with permission from Lessor are not to be removed or restored to the original condition unless required by Lessor, as provided in Section 10.1. All repairs for which the Lessee is responsible shall be completed prior to such surrender.

### Section 10.1     Title to Lessee Improvements upon Termination

All improvements, excluding Personal Property (defined in Section 10.2) located on the Premises at the expiration or earlier termination of this Lease, shall, at Lessor's option, become the sole property of Lessor. Notwithstanding the foregoing, Lessor reserves the right, in its sole discretion, to require Lessee to remove some or all of the improvements placed on the Premises by Lessee from the Premises upon termination of this Lease.

### Section 10.2     Lessee's Personal Property

Lessee's Museum pieces, spacecraft, removable decorations, detached floor coverings, signs, blinds, furnishings, trade fixtures and other personal property placed upon the Premises by Lessee ("Personal Property") shall remain the property of Lessee. At or before the termination of this Lease, Lessee, at Lessee's expense, shall remove from the Premises any and all of Lessee's Personal Property and shall repair any damage to the Premises resulting from the installation or removal of such Personal Property. Any items of Lessee's Personal Property which remain on the Premises after the termination date of this Lease may either be: (i) retained by Lessor without any requirement to account to Lessee therefor; or (ii) removed and disposed of by Lessor, without any requirement to account to Lessee therefor, with Lessor being entitled to recover all costs thereof from Lessee.

14 – Space Museum Lease

### Section 10.3    Time for Removal

The time for removal of any Personal Property or improvements made by Lessee which Lessee is required to remove from the Premises upon termination shall be as follows: (i) by the Expiration Date; or (ii) if this Lease is terminated prior to the Expiration Date, then all removal must occur within thirty (30) days following the actual termination date and Lessee must continue to pay all Rent due until such time as all of Lessee's Personal Property and the improvements required to be removed have been properly and completely removed.

### Section 10.4    Holdover

If Lessee fails to vacate the Premises at the time required, such holdover shall not be deemed to operate as a renewal or extension of this Lease but shall only create a tenancy at sufferance which may be terminated at will and at any time by Lessor.

### Section 10.5    For Rent and For Sale

During a period of time that is one hundred and twenty (120) days prior to the date fixed for termination of this Lease, Lessor may post on the Premises signs notifying the public that the Premises is for lease.  At any time during this Lease, Lessor may place signs on the Property notifying the public that the Property is for sale.

## ARTICLE 11.    ENVIRONMENTAL OBLIGATIONS OF LESSEE

### Section 11.1    Definitions

As used in this Lease, the following terms shall be defined as follows:

#### 11.1.1    "Environmental Laws"

Environmental Laws shall be interpreted in the broadest sense to include any and all Federal, State and Local statutes, regulations, rules and ordinances now or hereafter in effect, as the same may be amended from time to time, which in any way govern materials, substances or products and/or relate to the protection of health, safety or the environment.

#### 11.1.2    "Hazardous Substances"

Hazardous Substances shall be interpreted in the broadest sense to include any substance, material or product defined or designated as hazardous, toxic, radioactive, dangerous or regulated wastes or substances or any other similar term in or under any Environmental Laws.

#### 11.1.3    "Environmental Costs"

Environmental Costs shall be interpreted in the broadest sense to include, but shall not necessarily be limited to: (i) costs or expenses relating to any actual or claimed violation of or noncompliance with any Environmental Law; (ii) all claims of third parties, including governmental agencies, for damages, response costs or other relief; (iii) the cost, expense or loss to Lessor as a result of any injunctive relief, including preliminary or temporary injunctive relief, applicable to Lessor or the Premises; (iv) all expenses of evaluation, testing, analysis, clean-up, remediation, removal and disposal relating to Hazardous Substances, including fees of attorneys, engineers, consultants, paralegals and experts; (v) all expenses of reporting the existence of Hazardous Substances or the violation of Environmental Laws to any agency of the State of Oregon or the United States as required by applicable Environmental Laws; (vi) any and all expenses or obligations, including, without limitation, attorneys' and

15 – Space Museum Lease

paralegal fees, incurred at, before and after any trial or appeal therefrom or any administrative proceeding or appeal therefrom whether or not taxable as costs, including, without limitation, attorneys' and paralegal fees, witness fees (expert and otherwise), deposition costs, copying, telephone and telefax charges and other expenses; and (vii) any damages, costs, fines, liabilities and expenses which are claimed to be owed by any federal, state or local regulating or administrative agency.

### Section 11.2    Limited Business Use of Hazardous Substances

Lessee may, in the normal course of Lessee's business and to the extent necessary for Lessee's Permitted Use of the Premises, use certain Hazardous Substances on the Premises in compliance with all of the following conditions: (a) use of such Hazardous Substances is in compliance with all Environmental Laws; (b) use of such Hazardous Substances does not expose the Premises or neighboring properties to any meaningful risk of contamination or damage; (c) other than ordinary office and janitorial supplies and substances fully contained inside of automobiles located on the Premises. Lessee shall be permitted to use only those Hazardous Substances and in such quantities as are required to carry on Lessee's Permitted Use of the Premises. Lessor may condition its consent to the use or presence of any Hazardous Substance on the Premises upon Lessee's giving Lessor such additional assurances as Lessor, in its discretion, deems necessary to protect itself, the public, the Premises and the environment against damage, contamination, injury or liability therefrom, including, but not limited to, the installation (and removal on or before termination of the Lease) of reasonable protective modifications to the Premises, the posting of a security deposit, or an increase in insurance coverage. Lessor reserves the right to inventory or cause to be inventoried any such Hazardous Substances being used and to approve or deny use of the same. Ordinary janitorial supplies which are available over the counter for use by the general public may be used on the Premises without written permission from Lessor so long as they are used in small quantities for normal clean-up activities and in accordance with all laws and the provisions of this Lease. In no event shall Lessee store, handle, transport, dispose, or treat any Hazardous Substances on the Premises which are generated by or from cleanup, removal, or remediation operations or activities from third party sources outside the yard. No fuel tank storage is allowed on the Premises, except for emergency generator fueling tanks.

### Section 11.3    Environmental Inspection

Lessor reserves the right to inspect for Hazardous Substances and/or Lessee's management of Hazardous Substances on the Premises at any time, and from time to time, without notice to Lessee... If Lessor at any time during the term of this Lease or any extension thereof, has reason to believe that Lessee is handling Hazardous Substances contrary to the requirements of this Lease, in violation of this Lease or in any manner that may allow contamination of the Premises, Lessor may, without limiting their other rights and remedies, cause to be conducted, an environmental audit with respect to the matters of concern to Lessor. Lessor shall be given an original copy of the audit results. Lessee shall cooperate with all such requests.

### Section 11.4    Environmental Safety

Pursuant to the terms of this Lease, Lessee must comply with all applicable State, Federal and local laws and ordinances. As a part of this requirement, Lessee shall maintain Material Safety Data Sheets for each and every Hazardous Substance used by Lessee, Lessee's agents, employees, contractors, licensees or invitees on the Premises, as required under the Hazard Communication Standard in 29 C.F.R. §1910.1200, as it may be amended, redesignated or retitled from time to time, and comparable State and Local statutes and regulations. In order to ensure that such information is available to Lessor in the event of a spill or other emergency, all

16 – Space Museum Lease

such information shall be kept current at all times and a copy of all such materials shall be kept in a place known to and easily accessible to Lessor.

### Section 11.5    Disposal of Hazardous Substances

Lessee shall not dispose of any Hazardous Substance, regardless of the quantity or concentration, within the storm and/or sanitary sewer drains and plumbing facilities within the Premises, or other property of Lessor. The disposal of Hazardous Substances shall be in approved containers and removed from the Premises only in accordance with the law. If Lessee knows, or has reasonable cause to believe, that any release of a Hazardous Substance has come to be located on or beneath the Premises, Lessee must immediately give written notice of that condition to Lessor.

### Section 11.6    Notice to Lessor

Lessee shall immediately notify Lessor upon becoming aware of a violation or alleged violation of any Environmental Law and/or: (1) any leak, spill, release or disposal of a Hazardous Substance on, under or adjacent to the Premises or threat of or reasonable suspicion of any of the same; and/or (2) any notice or communication to or from a governmental agency or any other person directed to Lessee or any other person relating to such Hazardous Substances on, under or adjacent to the Premises or any violation or alleged violation of or noncompliance or alleged noncompliance with, any Environmental Laws with respect to the Premises.

### Section 11.7    Certification

Not later than thirty (30) days after receipt of written request from Lessor, Lessee shall provide a written certification to Lessor, signed by Lessee, which certifies that Lessee has not received any notice from any governmental agency regarding a violation of or noncompliance with any Environmental Law; or, if such notice was received, Lessee shall explain the reason for the notice, what has been done to remedy the problem and shall attach a copy of the notice. Lessee shall also certify that Lessee has obtained and has in force all permits required under Environmental Law. Copies of all such permits shall be made available to Lessor, LLC upon request.

### Section 11.8    Documentation of Hazardous Substances

Lessee shall maintain for periodic inspection by Lessor and deliver to Lessor, at Lessor's request, true and correct copies of the following documents (hereinafter referred to as the "Documents") related to the handling, storage, disposal and emission of Hazardous Substances, concurrently with the receipt from or submission to a governmental agency: Permits; approvals; reports and correspondence; storage and management plans; spill prevention control and countermeasure plans; other spill contingency and emergency response plans; documents relating to taxes for Hazardous Substances; notice of violations of any Environmental Laws; plans relating to the installation of any storage tanks to be installed in, under or around the Premises (provided said installation of tanks shall only be permitted after Lessor has given Lessee its written consent to do so, which consent may be withheld in Lessor's sole discretion); and all closure plans or any other documents required by any and all Federal, State and Local governmental agencies and authorities for any storage tanks or other facilities installed in, on or under the Premises.

17 – Space Museum Lease

# ARTICLE 12.    INDEMNITIES

### Section 12.1    General Indemnity

Lessee agrees to defend (using legal counsel acceptable to the party being defended), indemnify, and hold harmless Lessor from and against any and all actual or alleged claims, damages, expenses, costs, fees (including, but not limited to, attorney, accountant, paralegal, expert, and escrow fees), fines, and/or penalties (collectively "Costs") which may be imposed upon or claimed against Lessor or and which, in whole or in part, directly or indirectly, arise from or are in any way connected with: (1) any act, omission or negligence of Lessee or Lessee's respective partners, officers, directors, agents, employees, invitees or contractors; (2) any use, occupation, management or control of the Premises by Lessee, whether or not due to Lessee's own act or omission and whether or not occurring on the Premises; (3) any condition created in or about the Premises by Lessee, including any accident, injury or damage occurring on or about the Premises after the Commencement Date; (4) any breach, violation or nonperformance of any of Lessee's obligations under this Lease; (5) any damage caused by Lessee on or to the Premises. For purposes of the indemnity provisions of this Lease, "Lessee" shall be deemed to include Lessee and Lessee's respective partners, officers, directors, members, managers, agents, employees, invitees and/or contractors.

### Section 12.2    Environmental Indemnity

Without in any way limiting the generality of the foregoing General Indemnity, Lessee shall be solely responsible for and agrees to defend (using legal counsel acceptable to the party being defended), indemnify and hold harmless Lessor from and against all Environmental Costs claimed against or assessed against Lessor arising, in whole or in part, directly or indirectly, from acts or omissions of Lessee and Lessee's respective partners, officers, directors, members, managers, agents, employees, invitees and/or contractors on or about the Premises after the Commencement Date of this Lease or earlier if caused by Lessee or Lessee's respective partners, officers, directors, members, managers, agents, employees, invitees and/or contractors. This indemnification shall require Lessee to reimburse Lessor for any diminution in value of the Premises, the Property or other adjacent or nearby property, caused by Hazardous Substances, including damages for the loss or restriction on use of rentable or usable space or of any amenity of the Premises, the Property, or any other Lessor property, including damages arising from any adverse impact on marketing of space in or near the Premises, including the Property. Lessee's obligations shall not apply if the Hazardous Substances were deposited on the Premises by Lessor or its agents. Lessee shall be solely responsible to assure that Lessee and its agents or invitees do not bring Hazardous Substances onto the Premises, except as allowed by this Lease. Notwithstanding the foregoing, Lessee shall not be responsible for, and does not indemnify Lessor for, any actions of Lessor that cause environmental damage or a violation of any Environmental Law on the Premises.

### Section 12.3    Survival

This **ARTICLE 12** shall survive the termination of this Lease with respect to all matters arising prior to surrender of the Premises by Lessee.

### Section 12.4    Scope of Indemnity

For purpose of this **ARTICLE 12**, references to "Lessor" shall be deemed to include its respective officers, directors, employees, agents, and contractors, all of whom are fully indemnified as provided above.

18 – Space Museum Lease

## ARTICLE 13.    ASSIGNMENT AND SUBLETTING

Lessee shall not in any manner, directly or indirectly, by operation of law or otherwise, lease, assign, sublease, transfer or encumber any of Lessee's rights in and to this Lease or any interest therein, nor license or permit the use of the rights herein granted in whole or in part without the prior written consent of Lessor, which consent may be withheld in Lessor's sole discretion. Lessee shall not assign all or any part of its rights and interests under this Lease to any successor to its business through merger, consolidation, or voluntary sale or transfer of substantially all of its assets, without prior written approval of Lessor, which consent may be withheld in Lessor's sole discretion. This Lease may only be assigned with the express written consent of Lessor, which consent may be granted or denied in Lessor's sole discretion.

## ARTICLE 14.    GENERAL PROVISIONS

### Section 14.1    Covenants, Conditions, and Restrictions

This Lease is subject and subordinate to the effect of any covenants, conditions, restrictions, easements, mortgages, deeds of trust, ground leases, rights of way, and any other matters of record now or hereafter imposed upon the Premises and to any applicable land use or zoning laws or regulations. Lessee shall, upon request of Lessor, execute and deliver agreements of subordination in the form requested by Lessor.

### Section 14.2    Condemnation

If the Premises or any interest therein is taken as a result of the exercise of the right of Eminent Domain, this Lease shall terminate as to such portion as may be taken. If either Lessee or Lessor determines that the portion of the Premises taken does not feasibly permit the continuation of the operation of the facility by the Lessee, this Lease shall terminate. Such termination shall be effective as of the date of taking. Lessee shall not be entitled to, and hereby expressly waives any right to any part of any condemnation award or the proceeds of any such condemnation.

### Section 14.3    Nonwaiver

Waiver by either party of strict performance of any provision of this Lease shall not be a waiver of or prejudice the party's right to require strict performance of the same provision in the future or of any other provision.

### Section 14.4    Attorney Fees

If a suit, action, or other proceeding of any nature whatsoever (including any proceeding under the U.S. Bankruptcy Code), is instituted in connection with any controversy arising out of this Lease or to interpret or enforce any rights or obligations hereunder, the prevailing party shall be entitled to recover attorney, paralegal, accountant, and other expert fees and all other fees, costs, and expenses actually incurred and reasonably necessary in connection therewith, as determined by the court or body at trial or on any appeal or review, in addition to all other amounts provided by law. Payment of all such fees shall also apply to any administrative proceeding, trial, and/or any appeal or petition for review. Whenever this Lease requires one party to defend the other party, it is agreed that such defense shall be by legal counsel acceptable to the party to be defended, understanding that claims are often covered by insurance with the insurance carrier designating the defense counsel.

Case 16-30233-rld11    Doc 62-1    Filed 05/02/16

### Section 14.5    Time of Essence

It is mutually agreed that time is of the essence in the performance of all covenants and conditions to be kept and performed under the terms of this Lease.

### Section 14.6    Warranties/Guarantees

Lessor makes no warranty, guarantee, or averment of any nature whatsoever concerning the physical condition of the Premises or the Property, or suitability of the Premises for Lessee's use. It is agreed that Lessor will not be responsible for any loss, damage or costs which may be incurred by Lessee by reason of any such condition.

### Section 14.7    Headings

The Article and Section headings contained herein are for convenience in reference and are not intended to define or limit the scope of any provisions of this Lease.

### Section 14.8    Consent of Lessor

Whenever consent, approval or direction by Lessor is required under the terms contained herein, all such consent, approval or direction shall be received in writing from Lessor.

### Section 14.9    Notices

All notices required under this Lease shall be deemed to be properly served when actually received or the third business day after mailing, if sent by certified mail, return receipt requested, to the last address previously furnished by the parties hereto in accordance with the requirements of this Section. Until hereafter changed by the parties by notice in writing, sent in accordance with this Section, notices shall be sent to the following addresses:

If to Lessor:

The Michael King Smith Foundation.
3850 Three Mile Lane
McMinnville, Oregon 97128

If to Lessee:

The Captain Michael King Smith Evergreen Aviation Educational Institute
500 NE Captain Michael King Smith Way
McMinnville, Oregon 97128


Any notice given in accordance with the provisions of this **Section 14.9** shall be effective upon receipt (or refusal of receipt) at the address of the addressee, if delivered by personal delivery; any notice delivered by certified mail shall be deemed received by the addressee on the date signed for or on the date the receipt is returned as refused or unclaimed; or by express mail delivery left at the notice address, as evidenced by courier receipt. The addresses to which notices are to be delivered may be changed by giving notice of such change in address in accordance with this notice provision.

20 – Space Museum Lease

### Section 14.10    Governing Law

This Lease shall be governed and construed according to the laws of the State of Oregon, without regard to its choice of law provisions. Any action or suit to enforce or construe any provision of this Lease by either party shall be brought in the Circuit Court of the State of Oregon for Multnomah County, or Federal Court located in Multnomah County, Oregon. The Circuit Court of the State of Oregon for Multnomah County or the Federal Court located in Multnomah County shall have exclusive jurisdiction over all lawsuits brought by either party against the other with respect to the subject matter of this Lease, and each party hereby irrevocably consents to such exclusive jurisdiction and waives any and all objections it might otherwise have with respect thereto.

### Section 14.11    Nonwaiver

Waiver by either party to the strict performance of any provision of this Lease shall not be deemed a waiver of or prejudice of that party's right to require strict performance of the same provision in the future or of any other provision.

### Section 14.12    Survival

Any covenant or condition (including, but not limited to, environmental and land use obligations and indemnification agreements), set forth in this Lease, the full performance of which is not specifically required prior to the expiration or earlier termination of this Lease, and any covenant or condition which by its terms is to survive, shall survive the expiration or earlier termination of this Lease and shall remain fully enforceable thereafter.

### Section 14.13    Partial Invalidity

If any provision of this Lease shall be held to be unenforceable or invalid, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all of the other provisions of this Lease shall be deemed valid and enforceable to the fullest extent

### Section 14.14    Modification

This Lease may not be modified except by a writing signed by the parties hereto.

### Section 14.15    Successors

The rights, liabilities and remedies provided in this Lease shall extend to the heirs, legal representatives, successors and, so far as the terms of this Lease permit, successors and assigns of the parties. The words "Lessor," "Lessee," and their accompanying verbs or pronouns, wherever used in the Lease, shall apply equally to all persons, firms, or corporations which may be or become such parties to this Lease.

### Section 14.16    Limitation on Liability

Lessor's liability under this Lease shall be limited to whatever interest it holds in the Premises, subject to and subordinate to any rights of the lenders or creditors of Lessor.

### Section 14.17    No Light or View Easement

The reduction or elimination of Lessee's light or view will not affect Lessee's obligations under this Lease, nor will it create any liability of Lessor to Lessee.

21 – Space Museum Lease

### Section 14.18 Calculation of Time

Unless referred to as Business Days, all periods of time referred to in this Lease shall include Saturdays, Sundays, and Legal holidays. However, if the last day of any period falls on a Saturday, Sunday, or Legal holiday, then the period shall be extended to include the next day which is not a Saturday, Sunday or Legal holiday. "Legal holiday" shall mean any holiday observed by the Federal Government. "Business Days" shall mean Monday through Friday, excluding Legal holidays.

### Section 14.19 Exhibits Incorporated by Reference

All Exhibits attached to this Lease are incorporated by reference in this Lease for all purposes.

### Section 14.20 Brokers

Lessee and Lessor each represent to one another that they have not dealt with any leasing agent or broker in connection with this Lease and each agrees to indemnify and hold harmless the other from and against all damages, costs, and expenses (including attorney, accountant and paralegal fees) arising in connection with any claim of an agent or broker alleging to have been retained by the other in connection with this Lease.

### Section 14.21 Successors; the Parties

The rights, liabilities and remedies provided for in this Lease shall extend to the heirs, legal representatives, and, so far as the terms of this Lease permit, successors and assigns of the parties hereto. The words "Lessor" and "Lessee" and their accompanying verbs or pronouns, wherever used in this Lease, shall apply equally to all persons, firms, or corporations which may be or become such parties hereto.

### Section 14.22 Interpretation of Lease; Status of Parties

This Lease is the result of arms-length negotiations between Lessor and Lessee and shall not be construed against Lessor by reason of its preparation of this Lease document. Nothing contained in this Lease, including the method of computation of rentals or construction of Lessee Improvements, shall be deemed or construed as creating the relationship of principal and agent, partners, joint venturers, or any other similar relationship, between the parties hereto.

### Section 14.23 No Recordation of Lease

This Lease shall not be recorded.

### Section 14.24 Force Majeure

The time for performance of any of Lessee's or Lessor's obligations hereunder shall be extended for a period equal to any hindrance, delays or suspension in the performance of that party's obligations, beyond the party's reasonable control and directly impacting the party's ability to perform, caused by any of the following events: Unusually severe acts of nature, including floods, earthquakes, hurricanes and other extraordinary weather conditions; civil riots, war, terrorism, or invasion; major fire or other major unforeseen casualty; labor strike that precludes the party's performance of the work in progress; extraordinary and unanticipated shortages of materials, or significant changes in the law (each a "Force Majeure Event"). Lack of funds or willful or negligent acts of a party shall not constitute a Force Majeure Event hereunder. Further, it shall be a condition to any extension of the time for a party's performance

Case 16-30233-rld11   Doc 62-1   Filed 05/02/16

hereunder that such party notify the other party within five (5) Business Days following the occurrence of the Force Majeure Event and diligently pursue the delayed performance as soon as is reasonably possible.

### Section 14.25 Capacity to Execute; Mutual Representations

Lessor and Lessee each warrant and represent to one another that this Lease constitutes a legal, valid and binding obligation of that party. Without limiting the generality of the foregoing, each party represents that its governing body has authorized the execution, delivery and performance of this Lease by it. The individuals executing this Lease warrant that they have full authority to execute this Lease on behalf of the entity for whom they purport to be acting.

IN WITNESS WHEREOF, the parties hereto have subscribed their names.

THE CAPTAIN MICHAEL KING
SMITH EVERGREEN AVIATION
EDUCATIONAL INSTITUTE

By: _____

As Its: _TREASURER_

THE MICHAEL KING SMITH FOUNDATION

By: _____

As Its: _Trustee_

23 – Space Museum Lease

# EXHIBIT A

## (Legal Description of the Property Placeholder)

**24 – Space Museum Lease**

## EXHIBIT "A"

A tract of land in Section 23, Township 4 South, Range 4 West of the Willamette Meridian in Yamhill County, Oregon, more particularly described as follows:

BEGINNING AT A POINT on the South line of the Reuben Harris Donation Land Claim in said township and range, that is 2143.47 feet South 89°46'08" West from the Southeast corner of said claim; thence continuing South 89°46'08" West along the South line of said claim, 2107.01 feet, more or less, to a point that is 4250.48 feet West of the Southeast corner of said claim; thence North 00°23'30" East along the center of a gravel lane, 1059.46 feet; thence South 89°36'30" East 18.88 feet; thence North 00°25'50" East 824.02 feet to a point on the North line of that tract described in Contract of Sale between Elsie M. Maynard, et vir, as vendors, and Albert A. Albertini, et ux, as vendees, recorded May 5, 1965 in Film Volume 45, Page 136, Deed and Mortgage Records; thence East along the North line of said tract to a point that is 1810.81 feet North and 2133.87 feet North 89°15'57" West of the Southeast corner of said Harris claim; thence Southerly along the line as established by boundary line agreement recorded December 21, 1973 in Film Volume 97, Page 1871, Deed and Mortgage Records, the point of beginning.

EXCEPTING THEREFROM that portion conveyed to Floyd Hartzell, et al, by deed recorded September 6, 1962 in Film Volume 25, Page 414, Deed and Mortgage Records.

EXCEPTING THEREFROM that portion conveyed to H & R. Burch Limited Partnership by deed recorded in Film Volume 299, Page 1369, Yamhill County Deed and Mortgage Records.

EXCEPTING THEREFROM that portion thereof appropriated by the State of Oregon by and through its Department of Transportation in Stipulated Final Judgment CV89-120, recorded February 26, 1991 in Film Volume 252, Page 725, Deed Records.

ALSO EXCEPTING THEREFROM that portion conveyed to the City of McMinnville, a Municipal Corporation, by Dedication of Easement and Right of Way recorded in Instrument No. 200304463, Deed Records.

FURTHER EXCEPTING THEREFROM the following described tract of land: A tract of land in Section 23, Township 4 South, Range 4 West of the Willamette Meridian in Yamhill County, Oregon, and being more particularly described as follows:

2/7

BEGINNING at an iron rod that is North 90°00'00" West (WEST) 3740.00 feet and North 00°23'30" East 30.00 feet from the Southeast corner of the Rueben Harris Donation Land Claim No. 80, said point being on the North margin of Three Mile Lane; thence North 00°23'30", 939.63 feet to an iron rod; thence South 89°58'40" East 370.00 feet to an iron rod; thence North 00°23'30" East 727.91 feet to an iron rod; thence North 89°03'00" West 864.94 feet to a point on the West line of Parcel 1 of a tract of land described in deed from Evergreen International, Inc. to Evergreen Vintage Aircraft Inc., recorded in Instrument No. 200013228 Deed Records; thence South 00°24'52" West 623.85 feet along said West line; thence North 89°37'28" West 18.88 feet to an iron rod on said West line; thence South 00°22'32" West 1058.01 feet to the Southwest corner of said tract, being a point on the North margin of Three Mile Lane (30.00 feet from centerline); thence North 90°00'00" East (EAST) 513.76 feet to the point of beginning.

3/7



 HOFFMAN CONSTRUCTION COMPANY

EVERGREEN SPACE MUSEUM
DATE: 4-26-2008

Case 16-30233-rld11   Doc 62-1   Filed 05/02/16

## SCHEDULE 1.1
## ASSUMED LIABILITIES

- **Obligations related to Assigned Contracts.**

**SCHEDULE 1.1**
**ASSUMED LIABILITIES**

- **Obligations related to Assigned Contracts.**

**EXHIBIT 2.2(a)(i)**
**BID PROCEDURES ORDER**

{00289001.DOC; 2}

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In re:

THE MICHAEL KING SMITH
FOUNDATION,

              Debtor.

Case No.  16-30233-rld11

ORDER (1) AUTHORIZING AND
SCHEDULING AN AUCTION FOR THE
SALE OF SUBSTANTIALLY ALL ASSETS
OF THE DEBTOR FREE AND CLEAR OF
LIENS AND OTHER INTERESTS, (2)
APPROVING SALE PROCEDURES

       This matter came before the Court on _____, 2016, on the Debtor's Motion for Orders

(1) Authorizing and Scheduling an Auction for the Sale of Substantially All Assets of the Debtor

Free and Clear of Liens and Other Interests, (2) Approving Sale Procedures, (3) Approving

Purchase Agreement or Subsequent Overbid, (4) Scheduling a Hearing to Consider Approval of

the Sale, (5) Establishing the Form and Manner of Notices Related Thereto, and (6) Requesting

Waiver of the Stay Under Bankruptcy Rule 6004(f) filed on May 2, 2015 (Docket No. ___) (the

"Motion").   The Court having held an initial hearing on the Motion on _____, 2016, and

having considered the submissions and arguments of counsel and the files and records herein,

and being now fully advised in of the premises,

Page 1 – ORDER AUTHORIZING AUCTION AND APPROVING BID PROCEDURES

THE COURT FINDS as follows:

A.      This Court has jurisdiction over this matter and the case of the Michael King Smith Foundation (the "Debtor"), the Motion and the parties and property affected pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  To the extent required by law, each creditor and party in interest has acknowledged and consented to this Court's authority to enter this Bid Procedures Order as a final order of this Court, or all challenges to this Court's authority have been overruled or waived.

B.      Findings of fact herein shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact as appropriate.

C.      The notice provided regarding the Motion constitutes sufficient and adequate notice.  No further notice in connection with the entry of this Order is or shall be required.

D.      The Bid Procedures (attached as **Annex 1** to this Order) were proposed by the Debtor in good faith with the goal of maximizing the value of the Assets for the benefit of all creditors of the estate and other parties-in-interest.  Debtor has articulated good and sufficient reasons for authorizing and approving the Bid Procedures, which are reasonable and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Assets.

E.      Debtor's proposed Sale Notice (attached as **Annex 2** to this Order) is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the sale, the auction, and the assumption procedures.

F.      Debtor and Affordable Mid Coast Housing, LLC ("AMCH") entered into an Asset Purchase Agreement dated April 21, 2016 (the "AMCH Agreement") pursuant to which AMCH agreed to purchase certain assets described in Section 1.1 of the ACMH Agreement (the "AMCH Assets"), subject to the conditions set forth in the AMCH Agreement.

G.      Debtor and MHP, LLC entered into a Letter of Intent dated May 1, 2016 (the "MHP Letter of Intent") pursuant to which the parties expressed the terms on which they intend to enter into a binding agreement for MHP to purchase certain assets described in the MHP

Letter of Intent (the "MHP Assets"), subject to execution of and conditions set forth in a definitive agreement between the parties.

H. The Debtor has established and proved good and sufficient reasons for approval of the proposed sale of the AMCH Assets under the terms of the AMCH Agreement, and the sale of the MHP Assets under the terms of the MHP Agreement, subject to the sale procedures set forth in this Order.

I. Entry of this Order is in the best interests of Debtor, its estate, creditors and other parties-in-interest.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. The Motion is GRANTED as set forth below.

2. All responses or objections to the relief requested in the Motion and the exhibits thereto that have not been withdrawn, waived or settled are overruled.

3. The Sale Procedures attached as **Annex 1** are hereby approved and shall be used in connection with the proposed sale of the Purchased Assets.[1]

4. Any objections to the proposed Sale shall be in writing and filed with this Court no later than _____, **2016,** at 5:00 p.m. Pacific Time. Any party filing such an objection must attend the Sale Hearing (described below) and advocate its objection at such hearing. Any objection not filed, served, and/or advocated in accordance with this paragraph may be deemed waived and may be forever barred.

5. The Auction for the Purchased Assets will be held on _____, **2016**, at 9:00 a.m. Pacific Time, at the offices of Motschenbacher & Blattner LLP, 117 SW Taylor Street, Suite 300, Portland, Oregon 97204. The auction will be conducted openly, and all creditors will be permitted to attend. A record will be made of bidding at the Auction.

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

6.	The Sale Hearing will be conducted on _____, **2016,** at _____ Pacific Time before the Honorable Randall L. Dunn in Courtroom 3 of the U.S. Bankruptcy Court, 1001 SW Fifth Avenue, 7th Floor, Portland, Oregon 97204, to consider the entry of an order providing and approving, inter alia, the following: (a) the sale or other disposition of Debtor's assets to the Successful Bidder or Bidders free and clear of all liens, claims, interests, obligations, and encumbrances in accordance with 11 U.S.C. § 363(f); (b) that Successful Bidder or Bidders have not assumed any liability or obligations (except as specifically assumed by the successful bidder in the Asset Purchase Agreement signed by the respective bidder, as may be amended in a writing signed by the respective bidder or otherwise specifically provided in the Order Confirming the Plan); (c) that Successful Bidder or Bidders are not successors to Debtor; (d) that all persons who have received the Notice are bound by the order and are enjoined from pursuing Successful Bidder or Bidders to recover on any claims they may have against Debtor; and (e) that the sale agreement or agreements were entered into in good faith, without collusion, and from arms' length bargaining positions. Debtor shall be deemed to have accepted a bid and the Successful Bidder determined only when the bid for the Assets has been approved by the Court at the Sale Hearing.

7.	The Sale Notice in the form attached hereto as **Annex 2**, is hereby approved.

8.	The failure of any third party to file and serve an objection as ordered and directed herein shall be deemed the consent of such a party to the sale and transfer of the AMCH Assets to AMCH, the MHP Assets to MHP, or either or both sets of assets to the Successful Bidder(s) at the Auction.

9.	Subject to Court approval at the Sale Hearing, the Closing Date shall be no later than **June 30, 2016**, unless otherwise agreed to by the respective purchasers and the Debtor.

10.     As provided by Bankruptcy Rule 6004(h), this Order shall not be stayed for 14

days after the entry thereof and shall be effective and enforceable immediately on its entry on the

docket.

11.     Unless otherwise specified, all time periods set forth in this Order shall be

calculated in accordance with Bankruptcy Rule 9006(a)

### 

I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).


Presented by:

MOTSCHENBACHER & BLATTNER, LLP

By:  /s/ Nicholas J. Henderson
      Nicholas J. Henderson, OSB No. 074027
      nhenderson@portlaw.com
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone:  (503) 417-0500
Facsimile:  (503) 417-0501

Attorneys for Michael King Smith Foundation

cc: List of Interested Parties

**ANNEX 1**

**BID PROCEDURES NOTICE**

Nicholas J. Henderson
nhenderson@portlaw.com
MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: (503) 417-0500
Facsimile: (503) 417-0501

Attorneys for Debtor
   Michael King Smith Foundation

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>MICHAEL KING SMITH<br>FOUNDATION,<br><br>               Debtor. | Case No.    16-30233-rld11<br><br>NOTICE RE: BID AND SALE PROCEDURES<br>FOR THE SUBMISSION, RECEIPT AND<br>ANALYSIS OF BIDS IN CONNECTION WITH<br>THE SALE OF SUBSTANTIALLY ALL OF<br>DEBTOR'S ASSETS |

These Sale Procedures have been approved by order of the United States Bankruptcy Court for the District of Oregon (the "Court") in connection with the above captioned bankruptcy case of the Michael King Smith Foundation (the "Debtor") (the "Bid Procedures Order").

These Sale Procedures set forth the process by which Debtor is authorized to conduct the sale (the "Sale") by auction (the "Auction") of substantially all of Debtor's business assets as more particularly described in the Agreement (defined below). These Sale Procedures also set forth the terms by which prospective bidders may qualify for and participate in the Auction, thereby competing to make the highest and/or best offer for the assets being sold.

## A. Stalking Horse Bidders for the Purchased Assets

On April 21, 2016, the Debtor and Affordable Mid Coast Housing, LLC ("AMCH") entered into an Asset Purchase Agreement (the "AMCH Agreement") for the acquisition of certain of Debtor's assets as described in the AMCH Agreement, described and depicted on the attached **Annex 1-A** (the "AMCH Assets"). Among other things, AMCH agreed to pay a purchase price in an amount equal to $7,700,000 (the "AMCH Purchase Price") for the AMCH Assets, subject to the outcome of the Auction and the entry of an order of the Court (the "Sale Order") approving the sale of the AMCH Assets. The AMCH Assets do not include avoidance actions under Chapter 5 of the Bankruptcy Code or other Excluded Assets.

On May 1, 2016, the Debtor and MHP, LLC ("MHP") entered into a letter of intent (the "MHP Letter of Intent") regarding the acquisition of certain of Debtor's assets as described in the MHP Letter of Intent, depicted on the attached **Annex 1-B** (the "MHP Assets"). Among other things, MHP agreed to pay a purchase price in an amount equal to $2,850,000 (the "MHP Purchase Price") for the MHP Assets, also subject to the outcome of the Auction and entry of the Sale Order that approves the sale of the MHP Assets. The MHP Assets do not include avoidance actions under Chapter 5 of the Bankruptcy Code or other Excluded Assets.

Copies of the AMCH Agreement and the MHP Letter of Intent have been filed with the Court and may be obtained by contacting Christopher Sturgeon, Bankruptcy Assistant to Debtor's Counsel, at (503) 417-0511.

### B. Participation Requirements

To participate in the bidding process and to obtain access to due diligence materials, any person interested in purchasing the Assets (an "Potential Bidder") must deliver (unless previously delivered) to both Debtor and counsel for Debtor the following (the "Preliminary Bid Documents"):

1. An executed confidentiality agreement in form and substance acceptable to Debtor and its counsel;

2. Preliminary written proof by the Potential Bidder of its financial capacity to close the proposed transaction, to pay the amounts that would be due to the Debtor at Closing, including, but not limited to, its ability to satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Section 365 of the Bankruptcy Code, which may include current unaudited or verified financial statements of, or verified financial commitments (i.e., banking or capital references) obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which must be deemed satisfactory to Debtor in its business judgment.

As soon as practicable, and in any event within two business days after a Potential Bidder delivers the Preliminary Bid Documents, Debtor shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents. Debtor shall work with Potential Bidders during the two business-day period (as it may be extended by Debtor) to attempt to correct or cure any deficiencies in any Preliminary Bid Documents. Only those Potential Bidders whose Preliminary Bid Documents have been deemed acceptable at the end of such two business-day period (as it may be extended by Debtor) (each, an "Acceptable Bidder") may conduct a due diligence review with respect to the Assets or submit bids to acquire the Assets. Buyer is deemed an Acceptable Bidder

## C. Due Diligence Access

After receipt of an executed confidentiality agreement and notification of Acceptable Bidder status, Debtor will provide each Acceptable Bidder reasonable due diligence information, as requested as soon as reasonably practicable after such request. Debtor shall be entitled to use its business judgment in determining the extent to which an Acceptable Bidder is entitled to receive confidential competitive information.

## D. Bid Requirements

Any Acceptable Bidder that is interested in being a participant in the Auction and acquiring all or substantially all of the Assets (each a "Bidder") must submit a "Bid" as provided herein prior to 5:00 p.m. Pacific Time on _____, 2016 (the "Bid Deadline"). Any such Bid must:

1.  Identify the proponent of the Bid and an officer or employee who is authorized to appear, act on behalf of and bind the Bidder;

2.  Identify any party for whom the Bidder may be bidding with or on behalf of, indicate whether the bidder is a party to any agreement limiting the bidders at the Auction, and identify any relation of such parties to Debtor.

3.  Contain (a) a signed definitive asset purchase agreement in substantially the form of the Agreement (a "Competing Purchase Agreement") and (b) a comparison of such Competing Purchase Agreement to the Agreement, showing all the differences between the two. A Competing Purchase Agreement must:

    i.   Be in form and substance satisfactory to Debtor;

    ii.  Clearly designate the assets to be acquired (which must be all or substantially all of the Purchased Assets);

    iii. agree that the purchase price shall be at least $7,825,000 (i.e., $25,000 more than the $7,700,000 Purchase Price contained in section 2.1 of the Agreement, plus the Break-Up Fee of $100,000) (the "Minimum Initial Overbid Amount"), and the purchase price will be paid in cash, subject to the same adjustments, escrow, and other terms of the Agreement;

    iv.  be accompanied by a deposit in the form of cash, cashier's check or letter of credit issued by a federal or state chartered domestic bank in the amount of $1,000,000;

    v.   Not be subject to any (a) financing contingency; (b) contingency relating to the completion of unperformed due diligence; (c) contingency relating to the approval of the Bidder's board of directors or other internal approvals or consents; or (d) any conditions precedent to the Bidder's

obligation to purchase the Assets, other than those conditions included in the Agreement; and

     vi.  Not provide for the payment to the Bidder of any Break-Up Fee, topping fee, expense reimbursement or other similar fee or arrangement.

4.  be accompanied by financial information for the bidder sufficient to enable the Debtor to determine the bidder's creditworthiness and ability to close a sale of the Assets, and pay the full Break-Up Fee to Purchaser within three days after entry of the Sale Order if the bidder is the Successful Bidder, including information sufficient to demonstrate the bidder's ability to provide adequate assurance of future performance of obligations under any executory contracts or unexpired leases to be assumed and assigned to the bidder;

5.  by its terms, remain open and irrevocable through the conclusion of the Sale Hearing, unless extended by agreement of the parties.

6.  Be submitted to counsel for Debtor so as to be received not later than the Bid Deadline. Any Bid that meets all of the foregoing requirements, as determined by Debtor in its good faith discretion, shall be considered a "Qualified Bid." Counsel for Debtor shall, as soon as practicable, send a copy of each Qualified Bid received, if any, to the following parties: (i) counsel to the secured creditors, (ii) the United States Trustee; and (iii) counsel to each Bidder submitting a Qualified Bid (or if a Bidder does not have counsel, to the Bidder).

## E.  Evaluation of Qualified Bids

Prior to the Auction, Debtor shall evaluate the Qualified Bids and identify the Qualified Bid that is, in Debtor's business judgment after consultation with its secured creditors, the highest or otherwise best bid (the "Starting Bid"). No later than 2:00 p.m. two days prior to the Auction, Debtor shall notify Buyer and all parties who have submitted Qualified Bids (each a "Qualified Bidder") as to whether there will be an Auction, and if so, which Qualified Bid is the Starting Bid. If any interested bidder is deemed to be "unqualified" by the Debtor after consultation with its secured creditors and will therefore be precluded from participating in the auction, on the request to such unqualified bidder, the auction will be delayed, or if commenced, temporarily adjourned, while Debtor shall bring the issue to the Court for an immediate determination. Thereafter, the auction shall proceed with or without the participation of the affected potential bidder, in accordance with the court's ruling.

## F.  No Qualified Bids

If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur and Buyer will be deemed the Successful Bidder. Subject to the termination rights under the Agreement, Debtor will immediately pursue entry of a Sale Order by the Court approving the Purchase Agreement and authorizing the sale of the Purchased Assets to Buyer.

**G. Auction**

In the event Debtor determines that one or more Bids are Qualified Bids, then Debtor will conduct the Auction on _____, 2016, at _____ a.m. (the "Auction") with respect to the sale of the Purchased Assets at the offices of Motschenbacher & Blattner LLP, 117 SW Taylor Street, Suite 300, Portland, OR 97204, or at such other location as may be designated by Debtor. The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

1. The Qualified Bidders, including Buyer, shall appear in person or through duly-authorized representatives at the Auction.

2. Only Qualified Bidders, including Buyer, shall be entitled to bid at the Auction.

3. Bidding at the Auction shall begin at the Starting Bid.

4. Subsequent bids at the Auction, including any bids by Buyer, shall be made in minimum increments of $25,000 or as otherwise agreed by the Bidders or as set by the Debtor.

5. All bidding will be open, and all creditors are permitted to attend.

6. A record of bidding at the Auction will be made. Such record may be transcribed by a certified court reporter to ensure an accurate recording of the bidding at the Auction.

7. Each Qualified Bidder will be required to confirm on the record at the Auction that it has not colluded with any other person with respect to the bidding or the Sale.

8. The Auction shall be governed by such other procedures as may be announced by Debtor after consultation with its secured creditors or its counsel from time to time at the Auction; provided that any such other procedures shall not be inconsistent with the Sale Procedures Order or any other order in Debtor's Chapter 11 case.

**H. Acceptance of the Successful Bid**

Upon the conclusion of the Auction (if such Auction is conducted), Debtor, in the exercise of its reasonable, good-faith business judgment, shall identify the highest or otherwise best bid (the "Successful Bid"). The Qualified Bidder having submitted the Successful Bid will be deemed the "Successful Bidder." The Successful Bidder and Debtor shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which the Successful Bid was made.

Debtor will present the results of the Auction to the Court at the Sale Hearing, at which certain findings will be sought from the Court regarding the Auction, including, among other things, that (1) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Sale Procedures, (2) the Auction was fair in substance and procedure, (3) the Successful Bid was a Qualified Bid, and (4) consummation of the Sale contemplated by the Successful Bid is in the best interests of Debtor and its estate.

If an Auction is held, Debtor shall be deemed to have accepted a Qualified Bid only when (1) such bid is declared the Successful Bid at the Auction or by the Court, and (2) definitive documentation has been executed in respect thereof. Such acceptance is conditioned on approval by the Court of the Successful Bid and the entry of an Order approving such Successful Bid.

## I. Bankruptcy Court Approval of Sale

A hearing to consider approval of the sale to the Successful Bidder (or to approve the Purchase Agreement if no Auction is held) (the "Sale Hearing") and seek entry of a Sale Order is presently scheduled to take place at _____ **a.m. on _____, 2016**, Pacific Time or at such other time as is announced at the Auction by Debtor. The Sale Hearing will be held before the Honorable Randall L. Dunn, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Oregon, in Courtroom No. 3 of the U.S. Bankruptcy Court, 1001 SW Fifth Avenue, 7th Floor, Portland, Oregon. Debtor and the Successful Bidder, once the Successful Bidder has been determined, shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of a Sale Order in a form reasonably acceptable to Debtor and the Successful Bidder. Any objections to the Auction results must be filed with the Court by 5:00 p.m. Pacific Time on _____, **2016**. The Sale Hearing may be continued to a later date by Debtor by sending notice to all prospective bidders prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.

## J. Designation of Back-Up Bidder

Upon the conclusion of the Auction and the selection of the Successful Bidder, Debtor shall select the person submitting the next highest or otherwise best bid (the "Back-Up Bidder"). The bid of the Back-Up Bidder shall remain open until the second business day following the closing of a sale to the Successful Bidder. If for any reason the Successful Bidder is unable or unwilling to consummate an approved sale because of breach or failure to perform on the part of the Successful Bidder, the Back-Up Bidder shall be deemed to be the Successful Bidder. The purchase price shall be the amount of such Back-Up Bidder's last bid, and Debtor shall be authorized to effectuate the sale to the Back-Up Bidder without further order of the Bankruptcy Court. If, for any reason, the Back-Up Bidder fails to perform, Debtor shall tender full performance of all of its obligations under the Purchase Agreement to Buyer within two business days from the date Debtor learns of Back-Up Bidder's inability to close, and Buyer shall have the option, for two business days thereafter, to elect to purchase the Purchased Assets under the terms of the Agreement.

**K. Reservation of Rights to Modify Sale Procedures**

Debtor after consultation with its secured creditors reserves the right to modify these Sale Procedures in any manner that will best promote the goals of the bidding process and may impose, at or prior to the Auction, additional customary terms and conditions on the sale, including, without limitation, extending the deadlines set forth in these Sale Procedures, adjourning the Auction at the Auction, and/or adjourning the Sale Hearing in open court without further notice. The Debtor after consultation with its secured creditors may also cancel the Auction with respect to one or more lots, if the Debtor after consultation with its secured creditors believes that sufficient assets have been sold to enable the Debtor to receive amounts needed to satisfy all of its debts and obligations, including but not limited to secured claims, unpaid Yamhill County property tax claims, US Trustee fees and unsecured claims. Otherwise, unless all qualified bidders agree to a change in the auction procedures, the auction procedures will not be changed absent a future Court order.

DATED: _____, 2016

MOTSCHENBACHER & BLATTNER, LLP

By: /s/ Nicholas J. Henderson
    Nicholas J. Henderson, OSB No. 074027
    nhenderson@portlaw.com
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: (503) 417-0500
Facsimile: (503) 417-0501

Attorneys for Debtor The Michael King Smith Foundation

**ANNEX 1-A**

**LIST AND DEPICTION OF AMCH ASSETS**

# ANNEX 1-A

**Display planes (8 total)**
- Corsair FG-1D, N67HP
- P-51D Mustang, N51HD
- Canso PBY 5-A
- Cassutt Racer
- Ryan NYP - Spirit of St. Louis
- FW-190A Replica
- Ryan ST3KR #2161
- Douglas DC-3A-S1C3G, N16070

**Artifacts**
- Mark Hatfield Sculpture
- Rory Sculpture
- JN4 Curtis
- Victor Atiyeh Sculpture
- By the Seat of His Pants
- 1931 Ford Model A
- Mars Exploration Rover

**Buildings**
- Space Museum
- Water Park
- Chapel, subject to a mutually agreeable lease or easement in favor of Seller.

**Land**
- Tax Lot 600, as modified through lot line adjustments to match the property shown on attached <u>Exhibit B</u>, and all improvements thereon, including the Water Park Building and Space Museum Building,.
- The "Chapel" currently located where designated on Exhibit B.
- Easements from Seller to Buyer for:
  - Use of the portions of Tax Lot 1300 that consist of the parking lot associated with the Water Park, and the access road to the Water Park parking lot, as designated on Exhibit B;
- Easements from Buyer to Seller for:
  - Full and free access to the Chapel
  - Full and free access to adjoining parcels retained by Seller;
  - Use ½ of the parking spaces behind the Space Building to the extent allowed by local authorities and on an intermittent use basis;

**Furniture and equipment**
- All items belonging to Seller currently located anywhere on the Campus (but excluding MKS historic bedroom display); All Water Park rides, equipment, machinery, and equipment.

**PAGE 1 - ANNEX 1-A**



Evergreen Property Reconfiguration

1: Chapel: easement to be granted to Seller
2: Access road and parking lot to be retained
by Seller, with easement to be granted
to Buyer.

**ANNEX 1-B**

**DEPICTION OF MHP ASSETS**



Evergreen Property Reconfiguration

Phase 1 Yamhill County Property Line Adjustments

Case 16-30233-rld11

**PAGE 1 - ANNEX 1-B**

# ANNEX 2

# SALE NOTICE

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**Michael King Smith Foundation,**<br><br>Debtor. | **Case No.    16-30233-rld11**<br><br>NOTICE OF (1) MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S BUSINESS ASSETS; (2) AUCTION; (3) BIDDING PROCEDURES; (4) SALE HEARING; AND (5) OBJECTION DEADLINES |

   **PLEASE TAKE NOTICE** that Michael King Smith Foundation ("Debtor") moved for approval of the sale of its Assets as more particularly described in the AMCH Agreement described below (the "AMCH Assets"), and as described in the MHP Letter of Intent described below (the "MHP Assets") free and clear of all liens, claims and encumbrances to Affordable Mid Coast Housing, LLC ("AMCH") and MHP, LLC ("MHP"), respectively, if there are no higher and better offers from qualified bidders at an auction scheduled for _____, **2016**, at 9:00 a.m. (the "Auction").

   The sale of the AMCH Assets to AMCH is for the sum of $7,700,000, in cash at closing and pursuant to an Asset Purchase Agreement dated April 21, 2016 (the "AMCH Agreement"), entered into between Debtor and AMCH.

   The sale of the MHP Assets to MHP is for the sum of $2,850,000, in cash at closing and pursuant to definitive documentation to be entered into between the Debtor and MHP, consistent with the Letter of Intent dated May 1, 2016 (the "MHP Letter of Intent"), entered into between Debtor and MHP.

   Copies of the AMCH Agreement and the MHP Letter of Intent were filed with the Court, and may also be obtained by contacting Debtor's counsel at (503) 417-0511.

   Debtor believes that the Sale of its Assets to AMCH and MHP is in the best interests of the estate because the sale will maximize the amount that the Debtor, its estate and its creditors may realize for the value of the Assets.  Additionally, the Debtor's existing cash flow does not satisfy its debt service requirements.  While the Debtor's cash flow has been consistent, the Debtor's cash flow will not increase, and Debtor has found that it is impossible to raise additional capital with Debtor's current capital structure and existing leases with its tenants. Delaying a sale could seriously jeopardize the value of the Debtor's Assets.

   The proposed order approving the Sale provides that neither AMCH nor MHP shall have any liability or responsibility for any of the Debtor's existing liabilities or other obligations arising under or related to the Assets other than as expressly set forth in the AMCH Agreement, and that the transfer of the Assets to AMCH or MHP will not subject either party or their

affiliates, successors or assigns, or their respective properties, to any liability for claims against Debtor or the Assets by reason of such transfer.

   **PLEASE TAKE FURTHER NOTICE** that, pursuant to 11 U.S.C. §§ 105 and 363, Debtor proposes to sell its assets to the Successful Bidder or Bidders and obtain an order providing and authorizing, inter alia, the following: (1) that the sale is free and clear of all liens, claims, interests and encumbrances; (2) that the Successful Bidder or Bidders have not assumed any liability or obligation (except as specifically assumed); (3) that Successful Bidder or Bidders is not or are not successors to Debtor; (4) that all persons that have been served with this Notice are bound by the order and are enjoined from pursuing Successful Bidder or Bidders to recover on any claims they may have against Debtor; and (5) that the sale agreement or agreements were entered into in good faith, without collusion, and from arms' length bargaining positions.

   **PLEASE TAKE FURTHER NOTICE** that the Court entered an order authorizing Debtor to hold an auction to sell the Assets free and clear of all liens, claims, encumbrances and other interests, as provided in the Purchase Agreement if an overbid is received. The auction, if one occurs, is scheduled for _____, 2016, at 9:00 a.m. Pacific Time at the offices of Motschenbacher & Blatter LLP, 117 SW Taylor Street, Suite 300, Portland Oregon, 97204.

   **PLEASE TAKE FURTHER NOTICE** that the Court entered an order approving bidding procedures in connection with the Sale and the Auction. A copy of the Bid Procedures can be obtained from Debtor's counsel.

   **PLEASE TAKE FURTHER NOTICE** that competing bidders for the AMCH Assets are required to submit competing bids of at least $7,725,000, plus a Break-Up Fee of $100,000, and otherwise qualify as bidders in accordance with the approved Sale Procedures prior to 5:00 p.m. Pacific Time on _____, 2016.

   **PLEASE TAKE FURTHER NOTICE** that competing bidders for the MHP Assets are required to submit competing bids of at least $2,860,000, plus a Break-Up Fee of $100,000, and otherwise qualify as bidders in accordance with the approved Sale Procedures prior to 5:00 p.m. Pacific Time on _____, 2016.

   **PLEASE TAKE FURTHER NOTICE** that a hearing on the proposed Sale to AMCH, MHP, or any higher and better bidder at the auction (the "Sale Hearing"), is scheduled to be held on _____, 2016, at 9:00 a.m. Pacific Time, or at such later time as may be announced at the auction by Debtor, in Courtroom 3 of the United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, 7th Floor, Portland, Oregon.

   **PLEASE TAKE FURTHER NOTICE** that if you wish to object to the sale of the Purchased Assets, you must, on or before _____, 2016, at 5:00 p.m. Pacific Time, file a written objection to the sale with the Clerk of the Court, United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, 7th Floor, Portland, Oregon 97204.

   **PLEASE TAKE FURTHER NOTICE** that the Debtor is requesting the Court to waive the 14-day stay under Bankruptcy Rule 6004(f).

PAGE  2-    NOTICE REGARDING SALE OF DEBTOR'S
            ASSETS AND BID PROCEDURES

Copies of any of the pleadings or documents referenced herein may be obtained by contacting Christopher M. Sturgeon, assistant to Debtor's counsel (e-mail: csturgeon@portlaw.com; telephone: 503-417-0511).


DATED: _____, 2016

MOTSCHENBACHER & BLATTNER, LLP


By: /s/ Nicholas J. Henderson
　　　Nicholas J. Henderson, OSB No. 074027
　　　nhenderson@portlaw.com
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: (503) 417-0500
Facsimile: (503) 417-0501

Attorneys for Debtor
The Michael King Smith Foundation

EXHIBIT 2.3(a)
FORM OF BILL OF SALE

BILL OF SALE AND ASSIGNMENT

This Bill of Sale and Assignment (the "Bill of Sale") is made and entered into as of _____, 2016, by and between THE MICHAEL KING SMITH FOUNDATION UTA NOVEMBER 15, 2006 and as thereafter amended ("Assignor"), and Affordable Mid Coast Housing, LLC ("Assignee").

For good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged by Assignor, Assignor does hereby assign, transfer, convey and deliver to Assignee, its successors and assigns, free and clear of any liens or encumbrances created by, through or under Assignor, all items of tangible personal property owned by Assignor and situated upon and used exclusively in connection with the land described on the attached Exhibit A (the "Land") and the improvements located thereon (the "Improvements"), but specifically excluding any and all personal property owned by tenants or otherwise considered the property of tenants (the "Excluded Property") under any leases affecting the Land or Improvements (the "Personal Property"). A list of certain vehicles, planes, and equipment included in the Personal Property is attached hereto as Exhibit B, but such list does not include all items of Personal Property. A list of the Excluded Property is attached hereto as Exhibit C. Seller hereby represents and warrants to Buyer that Seller is the lawful owner of the Personal Property, that this Personal Property is free and clear of all liens, encumbrances, conditional sales contracts, security interests, and claims, and that Seller has all lawful right and authority to make this conveyance.

In addition, Assignor assigns to Assignee all of Assignor's rights, title, and interest in and to all permits, licenses, warranties, guaranties, plans, approvals, entitlements, development agreements, utility contracts, development rights, governmental contracts, water and mineral rights, certificates, prepaid fees, credits and other intangible rights and intangible property related to the Property, and all agreements, studies, reports, plans and other materials related to the Land and Improvements.

ASSIGNEE ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PERSONAL PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS, WHERE IS" CONDITION AND BASIS "WITH ALL FAULTS," EXCEPT AS SPECIFICALLY PROVIDED IN THE PURCHASE AND SALE AGREEMENT BETWEEN THE PARTIES DATED AS OF APRIL 21, 2016.

REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOLLOWS

This Bill of Sale may be signed in counterparts, and all counterparts so executed shall constitute one contract, binding on all parties hereto, even though all parties are not signatory to the same counterpart.

Dated this _____ day of _____, 2016.

THE MICHAEL KING SMITH FOUNDATION UTA DATED NOVEMBER 15, 2006 and as thereafter amended, a trust governed by the laws of the State of Oregon

By: _____

Its: _____

Debtor-in-Possession, Bankruptcy Case No. 16-30233-rld11

{00289001.DOC; 2}

EXHIBIT 2.3(b)
FORM OF DEED

**AFTER RECORDING, RETURN TO:**

_____
_____
_____

ATTN: _____

**Send Tax Statements to:**

_____
_____
_____

## STATUTORY WARRANTY DEED

THE MICHAEL KING SMITH FOUNDATION UTA NOVEMBER 15, 2006, Grantor, conveys and warrants to Affordable Mid Coast Housing, LLC, Grantee, the real property located in Yamhill County, Oregon, described in the attached Exhibit A (the "Real Property"), free of encumbrances, except as specifically set forth on the attached Exhibit B or encumbrances of record at the time of conveyance.

The true and actual consideration for the Real Property is $ _____ ..

BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010. THIS INSTRUMENT DOES NOT ALLOW USE OF THE PROPERTY DESCRIBED IN THIS INSTRUMENT IN VIOLATION OF APPLICABLE LAND USE LAWS AND REGULATIONS. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO DETERMINE ANY LIMITS ON LAWSUITS AGAINST FARMING OR FOREST PRACTICES, AS DEFINED IN ORS 30.930, AND TO INQUIRE ABOUT THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007,

SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

Dated this _____ day of _____, 2016.

THE MICHAEL KING SMITH FOUNDATION UTA DATED NOVEMBER 15, 2006 and as thereafter amended, a trust governed by the laws of the State of Oregon

By:_____
Its:_____
Debtor-in-Possession, Bankruptcy Case No. 16-30233-rld11

STATE OF_____)
                                              ) ss.
County of _____)

This instrument was acknowledged before me on this _____ day of _____, 20___, by _____ _____ of the Michael King Smith Foundation UTA dated November 15, 2006 and as thereafter amended, on behalf of the trust.

_____
NOTARY PUBLIC FOR _____
My Commission Expires: _____

**EXHIBIT A TO DEED**
**LEGAL DESCRIPTION**

**TO BE ATTACHED**

{00289001.DOC; 2}

## MEMORANDUM OF UNDERSTANDING
## BETWEEN
## EVERGREEN AVIATION MUSEUM
## AND MCMINNVILLE SCHOOL DISTRICT #40

## MCMINNVILLE SCHOOL DISTRICT ENGINEERING AND
## AVIATION SCIENCE ACADEMY

This Memorandum of Understanding is entered into by and between McMinnville School District #40 (District) and Evergreen Aviation Museum (Museum)

A. The District and Museum have jointly established the McMinnville School District Engineering and Aviation Science Academy (EASA) and the McMinnville School District video production program, SOAR for the benefit of the students of the District.

B. The Board of Directors of the District have approved the District's participation in EASA and SOAR.

C. The Board of Directors of the Museum have approved the Museum's participation in EASA and SOAR.

Therefore, based upon the understanding of the parties they hereby agree as follows:

1. The parties hereby jointly agree to the establishment and creation of EASA and SOAR.

2. District will supply staffing and supervision for EASA and SOAR and will be responsible for supervision of all students who participate in EASA and SOAR.

3. Museum will supply Museum staff as a resource to support District programs.

4. District will provide facilities and meeting space for EASA and SOAR students in District owned facilities and Museum will provide classroom and lab space for students in Museum owned facilities located in the Evergreen Space Museum and identified as EASA and SOAR classroom and lab spaces.

5. District shall indemnify and hold Museum harmless from any and all claims or liabilities arising out of the action and activities of District employees, agents, directors, and/or staff.

Exhibit 7.7

**Page 1 or 2 – Memorandum of Understanding**

6. Museum shall indemnify and hold District harmless from and all claims or liabilities arising out of the action and activities of Museum employees, agents, directors, and/or staff.

7. Museum will provide museum access and facility use for grade level STEM experience at no expense to District. District will provide staff, coordination and supervision of District grade level STEM activities.

8. This is the entire agreement between District and Museum. There are no further understandings or agreements or representations concerning EASA not included in this Memorandum of Understanding, District will not be charged for use of Museum property and facilities.

WHEREFORE the parties have signed this Memorandum of Understanding on the date set forth below. This Memorandum of Understanding in immediately effective.


**McMinnville School District #40**          **Evergreen Aviation Museum**


By: _____          By: _____
Maryalice Russell, Superintendent of          Evergreen Foundation Board
McMinnville School District #40          Representative


Dated _____, 2007          Dated_____,2007